Syllabus.

## Staunton.

### SMYTH BROTHERS-McCLEARY-McCLELLAN COMPANY
### v.
### BERESFORD.

September 16, 1920.

1. ILLEGAL CONTRACTS—*Agreement to Use Influence to Obtain Government Contracts.*—Defendants, in consideration that the plaintiff would procure for the defendants purchasers and contracts for horses, at prices which the defendants would be willing to accept, promised to pay to the plaintiff a compensation and commission for such service, to-wit, $5 for each horse so sold.

   *Held:* That this was not an undertaking to do anything illegal.

2. ILLEGAL CONTRACTS—*Agreement to Use Influence to Obtain Government Contracts.*—An undertaking to procure purchasers and contracts for horses at prices which the defendants would be willing to accept, might conceivably be executed either in a legitimate and proper fashion, or by the use of corrupt and illegal practices, but certainly it is not to be presumed that the use of illegal practices was intended or contracted for. In no respect does the language used contemplate or import the doing of anything illegal or improper.

3. ILLEGAL CONTRACTS—*Presumption in Favor of Legality.*—When a contract may or may not be illegal, according to the circumstances, it will be presumed that it only involves the doing of a lawful and proper act and will be sustained, as illegality is never presumed, but must be proved, or must clearly appear upon the fact of the contract.

4. AGENCY—*Action for Compensation of Agent—Instructions.*—In an action by an agent for commissions, an instruction as tendered relieved the defendants from liability in case of abandonment of the contract and failure to render the agreed services, whatever might have been the justification of the plaintiff for such abandonment and nonperformance.

   *Held:* That an amendment of the instruction by the court excepting from such consequences of relief an abandonment and

failure due either to the obstruction of the defendants or to their assent excusing the plaintiff from performance, was proper.

5. AGENCY—*Commissions—Instructions.*—An instruction in an action for commissions, that if the jury believed the defendants' version of the contract between the parties, the agreement was an "entire one, and not severable," and that, if the plaintiff failed to discharge his undertakings under this contract, unless he was hindered in such discharge, or relieved from such discharge, by the defendants, they should find for the defendants, was not erroneous under the circumstances of the case.

6. AGENCY—*Termination of Contract—Assent of Both Parties.*—The principal has no right as a matter of law to terminate the contract of agency, as long as the obligations of the parties under the contract continue, without the assent of the agent. The parties to a contract may terminate it by mutual consent.

7. AGENCY—*Commissions—Instructions.*—In an action by an agent against his principal for commissions, an instruction which accurately states the law with respect to the principles of the plaintiff's recovery in the event the jury gives credence to his version of the contract, is not erroneous.

8. AGENCY—*Commissions—Instructions.*—In an action by an agent for commissions on horses sold by his principal to a customer obtained by him, an instruction that even if the jury believed that under the contract of agency certain definite services were to be performed by the agent, yet if the defendants while the contract was in force notified the plaintiff that they would proceed no further in the execution of the contract between the plaintiff and the defendants, and thereby prevented the plaintiff from performing such services, then the plaintiff had a right to accept the situation, terminate all relations with the defendants, and sue for the breach of the contract and recover as damages the amount agreed upon in the contract on all horses sold, correctly stated the law of the hypothetical situation which it presented.

9. AGENCY—*Action for Commissions—Burden of Proof.*—In an action by an agent for commissions, the burden of proving his case is upon the plaintiff, and he must prove it by a preponderance of evidence in order to entitle him to recover.

10. EVIDENCE—*Preponderance of Evidence.*—The preponderance of the evidence does not necessarily mean a greater number of witnesses. It is the greater weight of all the evidence before the jury.

11. Questions of Law and Fact—*Province of Jury.*—It is within the province of the jury exclusively to determine the facts to be deduced from the evidence in the case.

12. Agency — *Action for Commissions — Instructions — Province of Jury.*—In an action by an agent for commissions, the following instruction was held proper: "The jury are to find from all the evidence, oral and written, whether or not a contract was made between the plaintiff and the defendants and what the terms of the agreement were; whether any compensation agreed to be paid the plaintiff was modified by the mutual consent of the parties, whether any contract they may find to have been made or modified was ended or its further execution abandoned by mutual consent of the parties; and the jury should apply the law as enunciated in the instructions of the court to their conclusions upon these and all other disputed matters arising upon the evidence."

13. Instructions—*Duty of Court to Give Instructions.*—Whenever there is evidence before a jury that would support a verdict upon a motion to set it aside, the court is obliged·to instruct, if requested to do so.

14. Agency—*Action for Commissions—Illegality of Contract—Evidence Insufficient to Require an Instruction.*—In an action by an agent for his commissions on a sale of horses, it was held that there was not sufficient record evidence to warrant an instruction that the jury should find for the defendants, provided they ascertained from the evidence that the contract stipulated that the plaintiff, for a contingent compensation, should exercise his personal influence with an inspector, or inspectors, of the French or Belgian governments, to secure the acceptance by them of the artillery and cavalry horses which it was contemplated should be offered for sale to said governments by the defendants for war purposes.

15. Agency—*Illegal Contracts—Government Contracts.*—A contract on the part of an agent to secrue by personal solicitation, or the exercise of personal influence, the acceptance by the inspectors of a foreign government of horses sold by his principal, would be an illegal contract. Government contracts cannot be lawfully secured by personal influence or solicitation.

16. Instructions—*Must be Based on the Evidence.*—A court is not justified in giving an instruction merely because it presents a proposition of law fundamentally correct. There must be more than a scintilla of evidence to support the instruction.

17. Illegal Contracts—*Presumptions and Burden of Proof.*—The law will not presume, unless it is forced to do so, that a person intends to do an illegal act. It will not, therefore, presume that the parties intended to make an illegal contract.

18. INSTRUCTIONS—*Must be Based on the Evidence.—Duty of Courts —Scintilla Doctrine.*—Unless the trial courts can pass on the evidence to the extent of ascertaining whether there is sufficient evidence to justify an instruction, then the abolition of the scintilla doctrine has not been effected. Whenever an instruction is offered, it is the duty of the court to consider whether there is evidence to support it, and if there be none, to refuse it, however sound it may be as an abstract proposition of law.

19. AGENCY—*Action for Commissions—Instructions.*—In an action by an agent for commissions, an instruction giving the jury sweeping and indefinite authority to avoid the agreement of the parties, on the ground that it was "excessive, extortionate, and unconscionable, by reason of the disproportion of the value of the services.to the agreed compensation," "or for any other reason," is objectionable.

20. INSTRUCTIONS—*Direction to the Jury to Consider an Instruction in Connection With Others.*—An instruction directing the jury to consider it in connection with other instructions upon totally different subjects was improper, as being confusing and misleading.

21. AGENCY—*Action for Commissions—Instructions.*—An instruction in an action by an agent for commissions, in which the contract is erroneously stated, should be refused.

22. INSTRUCTIONS—*Mixed Question of Law and Fact.*—It is error to devolve the determination of a mixed question of law and fact upon the jury without instructions as to the law.

23. AGENCY—*Action for Commissions—Reasonableness of Commissions.*—In an action by an agent for commissions, there was no evidence upon the reasonableness, or unreasonableness, of the commissions agreed upon. Both parties anticipated profit from the arrangement, and if the result was more profitable to one party than to the other, that fact furnished no reason for avoiding the contract in whole or in part.

24. CONTRACTS—*Consideration—Adequacy.*—While the courts refuse to give effect to a contract not supported by a consideration, and insist that the consideration must be something of value in the eyes of the law, yet it need not be adequate. Courts do not inquire into the proportionate value of the thing received; that is for the parties to settle. If the parties get that which they bargained for, and were not acting under fraud, mistake, or the like, the courts do not concern themselves with the relative values exchanged, or the wisdom of the contract. The promisor will not be heard to say that that which he contracted for was of no value, in case he has received the benefit of it, and would not have been entitled to such benefit except for the contract.

25. UNCONSCIONABLE BARGAINS—*What Constitutes.*—While the juris-
diction undoubtedly exists in the courts to avoid a contract on
the ground that it makes an unconscionable bargain, neverthe-
less an inequitable and unconscionable bargain has been defined
to be "one that no man in his senses and not under a delusion
would make, on the one hand, and as no fair man would ac-
cept, on the other." The inequality must be so gross as to
shock the conscience.

26. AGENCY—*Split Commissions—Instructions—Must be Based on
the Evidence.*—In an action by an agent for commissions, it
is not error to refuse an instruction upon the illegality of
split commissions, where there was no evidence in the case to
support such an instruction.

27. A G E N C Y — *Commissions — Instructions Ignoring Defendant's
Theory.*—In an action by an agent for commissions on horses
sold, defendants complained that the instructions given by the
court gave undue weight to the evidence tending to prove that
the compensation agreed upon between the plaintiff and the
defendants was $5 per horse, and that they entirely ignored
evidence going to show another basis of compensation, viz.,
$1 per horse. However, the jury having been instructed that
they could find the $1 contract, if they believed that the evi-
dence was to that effect, and that they should apply the law
enunciated by the court in the instructions, to their conclu-
sions, the jury very naturally would have applied the same
principles, *mutatis mutandis,* to a verdict ascertaining a com-
mission of $1 per horse sold that they had been directed to
apply to a verdict finding a commission of $5 per horse, and
the instructions given are therefore not subject to the criticism
that they ignored defendants' theory.

28. APPEAL AND ERROR—*Conflicting Evidence.*—The Supreme Court
of Appeals is bound by the verdict reached by a jury upon
consideration of disputed facts.

Error to a judgment of the Law and Equity Court of the
city of Richmond in an action of assumpsit. Judgment for
plaintiff. Defendants assign error.

*Affirmed.*

The opinion states the case.

*George Bryan* and *Smith & Gordon,* for the plaintiffs in
error.

*Williams & Mullen,* for the defendant in error.

SAUNDERS, J., delivered the opinion of the court.

This is a contest over commissions alleged by the defendant in error (plaintiff below) to be due under an oral contract between him and the plaintiffs in error. The controversy is brought before this court by a writ of error to the judgment of the Law and Equity Court of the city of Richmond.

The origin of the controversy was in this wise: Plaintiffs in error, who were the defendants in the trial court, are large horse dealers located in the city of Richmond. At the outbreak of the European war the concern was anxious to sell horses abroad to be used in the operations of war. A trip was taken to New York city to meet certain persons who were said to be buying horses for foreign countries, but, to use the language of a member of the firm who was a witness in the trial court, "the parties did not seem to have contracts, and nothing came of it." Later representatives of the firm made another trip to the same city to get in touch with some one who could aid them to secure a contract. Failing of success at first, they finally met a man named Quinton, who said that he could introduce them to an Englishman then in New York, who would, in all likelihood, be able to place a contract for them. This Englishman was Seton R. Beresford, the defendant in error. Beresford was a man of education, a native and citizen of England, but a resident of this country at different times since 1888. For two years, beginning with 1888, he was in Montana and Dakota, on a cattle ranch. In 1890 he went back to England, returning to this country in 1911, when he became connected with a banking house in New York city. In more than one instance he conducted important foreign business

for this concern. In 1914 he joined the firm of Rogers, Brown and Company, Wall street, New York, and at the outbreak of the war was engaged in formulating for his firm a co-operative shipping scheme of considerable magnitude. From this brief description of the plaintiff's activities in this country it will be seen that his associations indicate that he was a man of affairs in New York city, and not a casual visitor unknown in the business world of that great metropolis.

An appointment was made for the representatives of the plaintiffs in error (hereinafter to be referred to as Smyth Bros.) to meet Beresford at the Biltmore hotel. Pursuant to this arrangment, the meeting was effected, and after the introductions were completed, the matter which carried the representatives of the concern to New York was taken up. After hearing the statement of Smyth Bros. as to their plans and purposes, and being advised of the extent of their operations, the capacity of their stables, and the shipping facilities at Newport News, Beresford became interested, and agreed to go to Richmond to look over the ground. He made the trip either on that day or the next. While in Richmond he inspected the firm's plant, examined the horses on hand, and, after looking over the harbor at Norfolk, expressed himself as "feeling justified in going further." He then went to Lexington, Kentucky, to meet one Kelham, who was also an Englishman and an acquaintance of short standing of Beresford. Kelham was the buyer in America for Dalton, Parsons and Company, horse dealers in London, England. Beresford brought Kelham to Richmond to meet Smyth Bros. During the trial of this case, when Beresford was on the stand, it was admitted by counsel for Smyth Bros., "that he (*i. e.*, Beresford) brought us (*i. e.*, Kelham and Smyth Bros.) together." Following this meeting, Kelham made a contract with Smyth Bros. to buy horses from them. It was for secur-

ing this contract that Beresford alleges that he was to be remunerated by Smyth Bros., upon terms specifically agreed upon by the parties. According to the former, he was asked in New York by Smyth Bros. if he "could sell horses for them," and was told that if he could they "would be very glad to remunerate him." At this time nothing was said, according to Beresford, as to the terms of the remuneration. Later, so he states, a complete agreement was made in Richmond between him and James Smyth, acting for Smyth Bros. According to Beresford, this agreement was that "he should be paid five dollars a horse for every horse sold by Smyth Bros. to Kelham, and a super-commission of two dollars and a half on light horses."

The petition of the plaintiffs in error makes the following statement of the contract between Smyth Bros. and Beresford: "A contract was made between the plaintiff and the defendants by which he was to introduce them to Kelham, and secure a contract, or contracts, for horses for war purposes, plaintiff's remuneration to be five dollars per head." The contract between the parties was made in the latter part of October, 1914. It may be said in this connection that the defendants' version of what took place between them and Beresford, first in New York city, and later in Richmond, preceding and at the time of the contract for compensation, differs very materially from that given by the plaintiff, but it is admitted by the defendants that they "very readily agreed to give five dollars a head" for each horse sold to Kelham and accepted. They insist, however, that this sum was not to be paid to Beresford solely for bringing them and Kelham together and securing a contract, or contracts, but in part for that service and in other part for additional services to be rendered by the plaintiff. Be this as it may, after the contracts between Smyth Bros. and Kelham and Smyth Bros. and Beresford

were made, the defendants began to sell horses to Kelham at the agreed price.

Three shipments were made on which commissions were paid to Beresford. These commissions amounted to about $18,000. Sometime in December, 1914, Smyth Bros. became dissatisfied with the arrangement under which they were working, and early in that month they asked for a modification of Beresford's contract. In response to this request, Beresford wrote them on December 17th the following letter:

"As regards your suggestion that I should in the future forego part of what is payable to me from you on horses that you may provide for Mr. Kelham's business, I would like to point out that through my efforts you have been placed in a position to do a continuous business.

"One great advantage of this business has already been shown in the wide publicity that has been given to your operations. You were unable to sell your horses, or to establish yourselves with government contractors, whereas, now you have many very attractive offers of future contracts, and you are known to be established and prepared to do business with government contractors. This is all in addition to the contracts you have already filled and the offers that are being made to you by Mr. Kelham for future work.

"Under these circumstances, and knowing the assistance I have been to you, your suggestion that I should at such a moment consent to a reduction of my interest with you places me in a very difficult position. However, I am most anxious that you should have as free a hand as possible, so will gladly do what I can to assist you.

"I am leaving town for a day or two, but will take the matter up with you on my return. I wish to facilitate in every way Mr. Kelham's arrangements for shipping horses,

19

and this fact is also a very strong consideration with me in the matter. I am satisfied that you have supplied Dalton Parsons with very much superior horses to any they have had before and I am sure that they will be very pleased with them."

On December 18th Beresford wrote again to Smyth Bros. as follows:

"I have given full consideration to your assurances that your firm has lost money on the horses supplied for Mr. Kelham's business, and also to your request that I should examine your books on these transactions. I greatly regret that you should have been occasioned any loss.

"You ask me if, under the circumstances, I can see my way to modify the terms of my agreement with your firm for the payment of commission in the future. My answer is that I should be most willing to do so and I am submitting to you a fresh proposal and trust that it will meet with your approval."

Accompanying this letter, according to Beresford, was a draft of a new agreement which he was willing to make. Nothing came of this counter proposition; indeed, the defendants deny that it was ever received by them.

Smyth Bros. state that on December 18, 1914, they wrote to Beresford announcing their intention to terminate the contract. This letter is herewith reproduced:

"We hereby notify you of our intention to terminate forthwith any question of commission upon horses sold by us to Mr. Harold E. Kelham, as the said Mr. H. E. Kelham complains to us that the amount of commission paid you in the past has been without his knowledge and consent, and the amount is such that it prohibits us from doing any further business together."

On December 24th, Smyth Bros. wrote to Beresford as follows:

"We enclose herewith our check for $2,482.50, which Mr. Howard Bailey requested us to send you.

"So far we have no contract with Mr. Kelham. Horses are getting more difficult to buy all the time, and the contract prices are too low for us to make any money.

"Thanking you for past favors, and wishing you a merry Christmas, we are  *  *  *."

This letter was received by Beresford in New York and duly acknowledged. The plaintiff denies that he ever received the letter of December 18th, relating to the termination of the contract. On December 21st, according to the defendants, they had a conference with Beresford in which it was agreed that his commissions should be reduced to one dollar per head for each horse sold thereafter. The plaintiff denies that this agreement was made. On January 29, 1915, the defendants concluded to abrogate the alleged contract of December 21, 1914, and wrote to the plaintiff as follows:

"Referring to our agreement to pay you a commission of one dollar per head upon horses sold through you by us to Mr. Harold E. Kelham, we are writing you to say that inasmuch as Mr. Kelham states that the commission paid you by us in the past has been without his knowledge and consent, and as the amount of the commission is so large as to prohibit us from doing further business with him, the agreement between you and ourselves is hereby terminated."

This letter was sent by registered mail to Beresford at New York, but was returned undelivered as he had sailed for England. Thereafter the defendants had no further dealings with the plaintiff, but continued to make sales to Kelham during the year 1915. Beresford left for England about February 1, 1915, and did not return to the United States until May, 1916. Before leaving, according to his testimony, the defendants made this statement to him: "There is no use in your staying here, you had as well go back to England. We are not going to do any more business with Kelham." On another occasion before he left for Eu-

rope, the plaintiff alleges that the defendants told him: "There is no use in your going out to the yard (*i. e.*, the defendants' yard), Kelham is all done with."

On his return to this country in 1916, Beresford called up Smyth Bros. by 'phone, to ascertain whether anything had been done in the way of business during his absence. His version of what passed is that the firm told him that "they were not going to pay him anything more, that they had contracts, but that what they had paid him was good enough, that they had no intention of paying him anything more, and if there was anything that he wanted he must sue them." Thereupon, Beresford brought his action of assumpsit against the defendants for one hundred thousand dollars, that being the amount of his commissions on the horses sold by Smyth Bros. and not accounted for under the contract undertaken to be set up by the plaintiff in this proceeding.

Smyth Bros. filed a demurrer to the fifth count of the plaintiff's declaration, a plea of non-assumpsit, three special pleas, and a statement of their grounds of defense. Later additional grounds of defense were filed. The court overruled the demurrer, and the parties went to trial, with the result that the jury returned a verdict against the defendants for $90,250, with costs. The defendants moved to set this verdict aside, "as contrary to the law and the evidence, because of misdirections to the jury by the court, and because the verdict was excessive." The trial court overruled this motion, and the defendants applied for and secured a writ of error, which brings the whole matter before us for review.

Various errors are assigned by the plaintiffs in error: First, the action of the court in overruling the demurrer; second, the refusal of the court to grant certain instructions asked for by the defendants; third, the instructions actually given; fourth, the failure of the court to set aside the ver-

dict, for the reasons stated; and, fifth, "in entering judgment on the verdict."

The fifth or special count of the declaration demurred to is in the following terms:

"And for this, also, to-wit, that heretofore, to-wit, on or about the —— day of October, in the year 1914, the said defendants then being engaged in the business of buying, selling and dealing in horses and conducting a sales stable in the city of Richmond, Virginia, and being desirous of selling horses for use by the foreign nations then at war, made and entered into a contract with said plaintiff wherein and whereby the said defendants in consideration that the said plaintiff would procure for them purchasers and contracts for horses at prices which the defendants would be willing to accept for horses, then and there faithfully promised to pay to the said plaintiff, a certain reward, compensation and commission for such service, to-wit: Five dollars for each horse so sold. And the said plaintiff says that he relying on the said promise and undertaking of the said defendants, did, afterwards and forthwith procure and bring to said defendants, one Harold E. Kelham, who then and there did enter into contracts and did buy from the said defendants a large number of horses, the said Harold E. Kelham being the agent of certain London and Paris contractors, to-wit Dalton, Parsons and Company, who held contracts with the French and Belgian governments. And the said defendants did pay to the said plaintiff five dollars per horse for a certain number of horses but the said plaintiff under and in accordance with his agreement as foresaid, did procure and bring about the sale for the defendants of a large number of other horses, to-wit: 20,000, for which he has not been paid and by reason thereof the said defendants became and were liable to pay to said plaintiff five dollars per horse on, to-wit, 20,000 horses, that is, to-wit, the sum of one hundred thousand dollars."

The ground of demurrer assigned was that this count "sets forth a contract which was against public policy, illegal and void, and upon which no action could be maintained, to-wit: a contract that the plaintiff would for a contingent compensation, in money, dependent upon the success of his efforts, exert his personal influence with a subagent, or agents, for the English, French and Belgian governments, to induce the purchase from the defendants of a large number of horses, to-wit, 20,000 horses by said agents for said governments."

[1, 2] It will be perceived upon an inspection of the count cited, *supra*, that the arrangement or contract made and entered into between the defendants and the plaintiff, as set out in said count, was in terms as follows: That the defendants in consideration that the plaintiff would procure for them (the defendants) purchasers and contracts for horses, at prices which the defendants would be willing to accept, faithfully promised to pay to the plaintiff a compensation and commission for such service, to-wit, five dollars for each horse so sold. This was not an undertaking to do anything illegal. An undertaking to procure purchasers and contracts for horses at prices which the defendants would be willing to accept, might conceivably be executed either in a legitimate and proper fashion, or by the use of corrupt and illegal practices, but certainly it is not to be presumed that the use of illegal practices was intended or contracted for. In no respect does the language used contemplate or import the doing of anything illegal or improper.

[3] "Innocence, rather than guilt, is to be presumed in the affairs of life." As stated in *Burdine* v. *Burdine*, 98 Va. 523, 36 S. E. 995, 81 Am. St. Rep. 741: "When a contract may or may not be so, according to the circumstances, it will be presumed that it only involves the doing of a lawful and proper act and will be sustained, as illegality is never presumed, but must be proved, or must clearly appear upon the face of the contract."

Illegality does not clearly appear upon the face of the contract stated in the plaintiff's declaration. Quite the contrary. To procure for a firm of horse dealers contracts and purchasers for horses, at prices which they would accept, is a legitimate undertaking capable of being carried out in a legitimate fashion, by the use of proper and legitimate practice, not involving or calling for the use of personal influence. The demurrer was properly overruled.

The plaintiffs in error assign as further error the action of the court in refusing to give the instructions tendered by the defendants on the trial of the case. These instructions are herewith reproduced from the record as instructions 1-a, 2, 3, 4, 5 and 6. The plaintiffs in error also complain of the instructions given, to-wit, instructions A, B, C, D, E, F and G.

"1-a. If the jury believe from the evidence that the defendants notified the plaintiff in December, 1914, of their intention to terminate the five-dollar contract then existing between them and the plaintiff, as substantially embodied in the letter of October 26, 1914, if the jury believe that is a fact, and that the plaintiff acquiesced in and consented to a change in said contract from five dollars per horse to one dollar per horse, but leaving all the other elements of the first contract undisturbed; and if the jury further believe from the evidence that the plaintiff later voluntarily abandoned said one-dollar contract and failed to render the services which he had promised to perform, then they should find for the defendants.

"2. The court instructs the jury that if they believe from the evidence that the contract between the plaintiff and the defendants for a commission of five dollars upon each horse sold to A. E. Kelham was, because of the disproportion of the commission to the real value of the services alleged to have been rendered to defendants by the plaintiff in introducing them to said Kelham, or for any other reason, exces-

sive, extortionate and unconscionable, then the said contract was void to the extent of the excess over a fair and reasonable compensation for said service, the amount of which the jury may determine from the evidence. This instruction, however, is to be read in connection with instructions Nos. 3 and 4.

"3. The court instructs the jury that the law regards the relation between principal and agent in the same general manner and with nearly the same strictness as that of trustee and beneficiary, that an agent should not unite his personal and representative characters in the same transaction, and that the law will not permit him to be exposed to the temptation or brought into a situation where his own personal interest conflicts with the interests of his principal and with the duties which he owes his principal. The mere fact that a reasonable consideration is paid and that no undue advantage is taken is not of itself sufficient. The court instructs the jury that Harold E. Kelham, as agent of the purchasers, Dalton, Parsons and Company, had no right to receive a commission or other compensation from the sellers of the horses, for a commission upon the sale of which this action was instituted, and if the jury believe from the evidence that the plaintiff, Beresford, was an 'associate' of said Kelham in said transaction and received a part of the commission paid Kelham by the defendants, the jury should find for the defendants.

"4. If the jury believe from the evidence that the contract between the plaintiff and the defendants was that the plaintiff would in consideration of a certain sum per head not only secure an offer or offers from foreign governments to purchase defendants' horses, but that plaintiff would also assist and co-operate with the defendants in the inspection of said horses and in securing their approval by the agents of the purchaser or purchasers, then the court instructs the jury that said contract was an entire one of joint adventure

and is not severable; and if the jury believe from the evidence that the plaintiff took no part in the inspection and securing the approval by the agents of the purchaser of the horses sold by the defendants after January 1, 1915, or in assisting about the shipping of said horses protecting the territory of defendants or helping them in other ways, but voluntarily left the country and abandoned said joint adventure, they should find for the defendants.

"5. The jury are further instructed that the plaintiff, in order to recover in this case, must do so upon the allegations of his declaration, and therefore if the jury believe from the evidence that the five dollar contract was ended by an agreement of defendants and plaintiff to that effect or was changed by like agreement to a one dollar contract, then the plaintiff cannot recover under the declaration in this case, which alleges the making of a five-dollar contract only, and the jury must find for the defendants.

"6. If the jury believe from the evidence that the contract between the plaintiff and the defendants was that the plaintiff would, among other things, for a contingent compensation exert his personal influence with an inspector or inspectors of the French or Belgian governments to secure the acceptance by them of the artillery and cavalry horses which it was contemplated should be offered for sale to said governments by defendants for war purposes, the said contract was void as against public policy without reference to the question whether or not improper means were contemplated or used in its execution, and the jury should, without regard to any other instruction granted by the court in this case, find for the defendants.

"A. The court instructs the jury that the defendants had no right as a matter of law to terminate any contract they may have made with the plaintiff, as long as the obligations of the parties under the contract continued, without the assent of the plaintiff. The parties to a contract may terminate it by mutual consent."

"B. The court instructs the jury that if they believe from the evidence that the defendants entered into a contract with the plaintiff for the payment to the plaintiff of five dollars per horse upon all the horses which they should sell through him and that the contract embraced no other undertaking on the part of the plaintiff and that the plaintiff did bring the defendants and Kelham together, and as a result thereof a sale of 20,936 horses was made by defendants to Kelham and that no reduction of the said amount per horse was agreed to by the plaintiff at any period while said horses were being sold, and that said contract was not by mutual consent terminated by the parties before all of the said horses were sold, then they should find for the plaintiff and fix his damages at five dollars per horse on the number of horses sold, after deducting the 2,886 horses included in the first three shipments on which the commission was paid.

"C. If the jury believe from the evidence that the defendants notified the plaintiff in December, 1914, of their intention to terminate the five-dollar contract then existing between them and the plaintiff, as substantially embodied in the letter of October 26, 1914, and the jury believe that the terms of said letter were a part of the contract, and that the plaintiff acquiesced in and consented to a change in said contract from five dollars per horse to one dollar per horse, but leaving all the other elements of the original contract undisturbed; then if the jury further believe from the evidence that the plaintiff voluntarily abandoned said one dollar contract and failed to render the services which he had promised to perform and was not prevented or excused by the defendants from performing said personal services, then they should find for the defendants.

"D. If the jury believe from the evidence that the contract between the plaintiff and the defendants was that the plaintiff would in consideration of a certain sum per head

not only secure an offer or offers from foreign governments to purchase defendants' horses, but that plaintiff would also assist and co-operate with the defendants in the inspection of said horses and in securing their approval by the agents of the purchaser or purchasers and render personal services in assisting about the shipping and protecting defendants in their territory, then the court instructs the jury that said contract was an entire one and is not severable; and if the jury believe from the evidence that the plaintiff refused or failed to take part in the inspection and securing the approval by the agents of the purchaser of the horses sold by the defendants after January 1, 1915, and to render said services, but voluntarily left the country and abandoned said contract without being prevented or excused by the defendants from further assisting in said matters connected with sales of horses which might be made by defendants, then the plaintiff violated the contract on his part and cannot recover.

"E. The court instructs the jury that even though they may believe from the evidence that the plaintiff agreed as a part of his contract, in consideration of the payment of so much on each horse sold, to perform some additional specified and definite services besides producing a purchaser, yet if the defendants while the contract was in force notified the plaintiff that they would proceed no further in the execution of the contract between the plaintiff and the defendants and thereby prevented the plaintiff from performing such services, then the plaintiff had a right to accept the situation, terminate all relations with the defendants and sue for the breach of the contract and recover as damages the amount agreed upon in the contract on all horses sold to the said Kelham.

"F. The court instructs the jury that since there is no evidence that the contract entered into between the plaintiff and defendants for the payment of a commission to the

plaintiff on all horses sold to Kelham or Dalton, Parsons and Company was in any way dependent or conditioned on the profits or losses made or sustained by the defendants from said sales, the jury are instructed that if they believe from the evidence and the instructions of the court that the plaintiff made a contract with the defendants, which the defendants have violated, and the plaintiff is entitled to recover, then the fact of such profits or losses by the defendants would not lessen the plaintiff's right of recovery.

"G. The court instructs the jury that the burden of proving his case is upon the plaintiff and that he must prove it by a preponderance of evidence in order to entitle him to recover; the preponderance of the evidence does not necessarily mean a greater number of witnesses. It is the greater weight of all the evidence before the jury.

"The court instructs the jury that it is within their province exclusively to determine the facts to be deduced from the evidence in this case.

"The jury are to find from all the evidence, oral and written, whether or not a contract was made between the plaintiff and the defendants and what the terms of the agreement were; whether any compensation agreed to be paid the plaintiff was modified by the mutual consent of the parties; whether any contract they may find to have been made or modified was ended or its further execution abandoned by mutual consent of the parties; and the jury should apply the law as enunciated in the instructions of the court to their conclusions upon these and all other disputed matters arising upon the evidence."

Instruction C is instruction 1-a, tendered by the defendants with the following words inserted after the word "perform," in the concluding line of 1-a, and before the concluding words of the sentence, to-wit, "and was not prevented or excused by the defendants from performing said personal services."

Smyth Bros. Et Als v. Beresford, 128 Va. 137. 157

Opinion.

[4] As tendered, instruction 1-a relieved the defendants from liability, in case of abandonment of the contract and failure to render the agreed services, whatever might have been the justification of the plaintiff for such abandonment and non-performance. The effect of the amendment of the court was to except from such consequences of relief an abandonment and failure due either to the obstruction of the defendants or to their assent excusing the plaintiff from performance. There was no error in this modification of the instruction.

[5] Instruction D is defendants' instruction No. 4, amended in various particulars by the court. It is not perceived that these amendments are to the prejudice of the defendants. Instruction D instructs the jury that if they believe the defendants' version of the contract between the parties, the agreement was an "entire one and not severable," and that if the plaintiff failed to discharge his undertakings under this contract, unless he was hindered in such discharge, or relieved from such discharge, by the defendants, they should find for the defendants. The modified instruction correctly states the law, and the court did not err in giving it in that form.

[6, 7] Instructions A and B, in their original form, were offered by the plaintiff and amended by the court. These instructions accurately state the law, the first with respect to the termination of a mutual contract, the second with respect to the principles of the plaintiff's recovery, in the event the jury gave credence to his version of the contract.

[8] Instruction E correctly states the law of the hypothetical situation which it presents. This instruction was excepted to, but apparently there is no insistence upon the exception. At any rate there is no error in the instruction.

[9-12] Instruction G is an instruction offered originally by the defendants and amended by the court by the addition of two paragraphs. The amendments were proper and sub-

mit the case to the jury on the law announced, and on the facts, in the most sweeping fashion, correctly advising them as to their powers and duties, and the principles to be pursued in the exercise of those powers, and the discharge of those duties.

Instruction 5, tendered by the defendants and rejected, states an erroneous conclusion, and was properly rejected.

[13] Instruction 6, which was offered by the defendants and rejected, presents in connection with the evidence the same question of law which was raised by the demurrer. The plaintiffs in error, in support of their contention that it was error on the part of the court to reject this instruction, rely upon the well established principle, that "whenever there is evidence before a jury that would support a verdict upon a motion to set it aside, the court is obliged to instruct, if requested to do so" (Burks' Pl. & Pr., 504-5; *Carpenter* v. *Smithey*, 118 Va. 547, 88 S. E. 321), and insist that in the instant case, if the instruction had been granted and the jury had found for the defendants, the "verdict would have found abundant support in the evidence."

This contention requires a careful scrutiny of the evidence on the part of this court. It may be conceded that the instruction correctly states the law of the hypothetical situation presented in the instruction, so that the necessary, indeed the sole inquiry on our part in this connection is, whether there is in the record sufficient evidence to support a verdict in accordance with said instruction. *C. & O. Ry. Co.* v. *Stock*, 104 Va. 97, 51 S. E. 161.

[14] The proposition presented to the jury by the instruction is that they should find for the defendants, provided they ascertain from the evidence that the contract stipulated that the "plaintiff, for a contingent compensation, should exercise his personal influence with an inspector, or inspectors, of the French or Belgian governments, to secure the acceptance by them of the artillery and cavalry horses

which it was contemplated should be offered for sale to said governments by the defendants for war purposes." Presumably there is no stronger evidence in the record to support this instruction than that cited by the plaintiffs in error in their petition. The plaintiffs in error insist in said petition that while "there are numerous other references to the same subject in the testimony, the extracts cited are sufficient to show that the question of fact concerning the plaintiff's personal services to the defendants in the inspection, and the nature of those services and reasonable inferences therefrom, were proper subjects for the consideration of a jury." The extracts cited in the petition are herewith reproduced:

"Q. And the French government sent inspectors here to see whether the horses came up to what was agreed upon, did they not?

"A. Originally they inspected them in France.

"Q. I am not talking about originally; I am talking about as far as this contract here is concerned that you are suing on.

"A. Yes.

"Q. I say, inspectors were sent here by the French government to inspect those horses bought at a fixed price for the French government?

"A. Yes.

"Q. Now it is a fact, is it not, that when they were inspected by the French inspectors, they were branded?

"A. That is so."

In the letter of October 26, 1914, written by plaintiff at Lexington, Ky., to defendants, plaintiff said, among other things: "We could inspect 1,000 very soon. On Wednesday we will discuss details, and I shall be prepared to deal with you right away, and as I have said already, to give you my personal assistance in every way."

The defendant, J. C. Smyth, testified as follows:

"Q. Now after the negotiations in New York, and the visit of Mr. Beresford here, after you found that he was working on a commission, or brokerage, you entered into a contract to pay him five dollars a head for all horses sold through him to Mr. Kelham that would be accepted by the inspector, did you not?

"A. Yes, sir."

The defendant, Thomas A. Smyth, testified as follows:

"A. As I said before, Mr. Beresford had a flat rate of five dollars to give us all the assistance he could; but Mr. Beresford seemed to have the idea of getting all the money he could out of us. Whenever he saw an opportunity of getting something we must have, then he raised his commissions, which we understood when we made the contract he was to render all the services he could for five dollars. When he saw this boat was necessary he asked for another five dollars; it was worth more to us, I suppose, but he took a boat belonging to another firm and gave it to us. When he got us in a hard place, he got out of us all he could. There was a man who was an inspector in Memphis; our inspectors were very slow, they would brand, maybe, 100 horses a day. Count Montjour would brand 250 a day, and Mr. Beresford told me that if we would give him a dollar more he would get this fast inspector for us. We saw this man could ship fast. When he saw an extra opportunity, he got all he could."

The defendant, A. L. McClellan, testified as follows:

"Q. I would like for you to state to the jury what services Mr. Beresford rendered you in November and December. He says that all he had to do was to introduce you. Please state what the contract was.

"A. Mr. Beresford was—I don't know what to call it exactly, but he was one of the principal men in managing the inspection; I would say that he was our interpreter in a good many ways, he could speak French, and he looked after those things in general, and the shipping matter, managing the boats. I used often to see him bring up a list of the boats, when they would arrive and things of that kind.

"Q. How much time did he spend at the yards?

"A. Practically every day. We used to send down for him to the hotel every morning. He was a good worker. He took dinner with us."

*Plaintiff's Cross-Examination.*

"Q. You say that you bought some few horses at a high price. What were they, top horses, or show horses?

"A. Well, they don't have to be a show horse to get $175 and $200 for. What I mean is that they were better horses than the lesser price horses that would go in. Mr. Beresford understands that. If the inspectors took ten fine horses and a horse not so good came along they would take him.

"Mr. Smith: Like packing apples in a barrel?

"Witness: No, you would take an unsound apple, but they wouldn't take a horse that was unsound. They would take a lot of heavy horses, and then maybe one not so good in flesh."

Upon rebuttal the plaintiff testified as follows:

"Q. On the first inspection of horses, do you know whether they kept the inspectors waiting here?

"A. Yes, the inspectors were waiting here for several days before they were ready for them.

"Q. Was Count Mountjoy an inspector who could be influenced?

"Mr. Smith: If your honor please, I object to that.

21

162 Smyth Bros. Et Als v. Beresford, 128 Va. 137.

Opinion.

"The Court: Was he influenced in any way?

"Mr. Smith: Nobody has said that he was influenced in any way. The only thing that has been said was that he was a fast inspector. There has never been any intimation that there was anything wrong with the inspection.

"The Court: Mr. Beresford has already stated on cross-examination that these inspectors were men of the highest type and could not be influenced by anybody."

[15, 16] There is nothing in this evidence to indicate that the plaintiff undertook, for a contingent consideration, to exert his personal influence with the inspectors of foreign governments to secure the acceptance by them of the artillery and cavalry horses which it was contemplated should be offered for sale to said governments by the defendants for war purposes. It is undoubtedly true that a contract on the part of Beresford to secure by personal solicitation, or the exercise of personal influence, the acceptance by the inspectors of a foreign government of the horses of the defendants, would be an illegal contract. Many authorities are cited in support of the proposition that government contracts cannot be lawfully secured by personal influence or solicitation, but a court is not justified in giving an instruction merely because it presents a proposition of law fundamentally correct. It may be conceded that "personal influence is not a vendible article, in our system of laws and morals," but *quoad* the case in judgment this principle is merely an abstraction, unless there is evidence in the record tending to show that the plaintiff undertook to exercise his influence, and this evidence must be more than a scintilla. It must be sufficient to support a verdict if credence is given to it. A jury is not entitled to indulge in surmise, conjecture or speculation. The plaintiffs in error seem to think that the language of the declaration, referring to Harold E. Kelham, as follows: "The said Harold E. Kelham being the agent of certain London and Paris con-

tractors, to-wit, Dalton, Parsons and Company, who held contracts with the French and Belgian governments," justifies the conclusion, as a fair and legal inference, that Kelham was a sub-agent, or sub-contractor, with the French and Belgian governments, and that they, the defendants, were dealing with those governments. We draw no such conclusion from the language, either standing alone or considered with its associated language in the declaration. The statements of the declaration simply mean that Kelham, who made the contract with Smyth Bros., was the American buyer for Dalton, Parsons and Company, an English contracting company holding contracts to furnish horses to the French and Belgian governments.

And just as this language fails to justify the conclusion that Kelham was a sub-agent of, or sub-contractor with, the French and Belgian governments, so does the evidence cited and relied upon fail to support the contention that Beresford undertook to do an illegal thing, namely, to secure action favorable to Smyth Bros. by the exercise of personal influence over the inspectors. It is not contended that the inspectors were influenced. The following citation is made from the evidence:

"Q. Was Count Montjoy an inspector who could be influenced?

"Mr. Smith (of counsel for the defendants): If your honor pleases, I object to that.

"The Court: Was he influenced in any way?

"Mr. Smith: Nobody has said that he was influenced in any way. The only thing that has been said was that he was a fast inspector. There never has been an intimation that there was anything wrong with the inspection."

In this connection, the petition of the plaintiffs in error makes the following statement: "Defendants have never

suggested, and do not now suggest, that there was anything corrupt in the relation between the plaintiff and the inspectors." This being so, our inquiry, of necessity, is limited to the ascertainment whether the evidence in the case shows an agreement on the part of the plaintiff to use influence with the inspectors, who apparently were not and could not be influenced in the sense contemplated by the instruction. The defendant, Thos. A. Smyth, does not state that Beresford was to exercise his personal influence with the inspectors. His version of the contract is that the plaintiff for a flat rate of five dollars for each horse sold, was to give the defendants all the assistance that he could. But this was an undertaking, according to the general rule of interpretation appropriate to such an agreement, to do all things that were lawful and proper on the part of the plaintiff to make the joint adventure successful, not an undertaking to do something that would avoid 'the contract between the parties, and thereby defeat the plaintiff's right of recovery. The only thing in the extracts from the record, cited *supra*, that by any process of inference or conjecture may be considered to support the contention that Beresford undertook to secure contracts for the defendants, or action favorable to the defendants' interests, by the exercise of personal influence, is the following sentence in the letter of October 26, 1914, written by the plaintiff to the defendants when the former was in Kentucky: "On Wednesday we will discuss details, and I shall be prepared to deal with you right away, and as I have said already, to give you my personal assistance in every way." The words "my personal assistance in every way," are greatly relied upon by the defendants to support their contention that the original contract was an undertaking on the part of Beresford to secure a contract, or contracts, for the defendants by unlawful methods and practices.

The words last cited assuredly do not import of necessity an intention on the part of the plaintiff to execute his freely

tendered offer of assistance in an unlawful manner. The joint adventure upon which Beresford and Smyth Bros. were embarking held out the promise of great profits to all concerned. It was to the interest of the plaintiff, not only to secure a contract for the defendants on the agreed terms, but to make that contract a continuing contract on the largest possible scale of operations. Any assistance that Beresford could afford to effect that consummation was decidedly in his own immediate interest, and there were many lawful and proper things that he could do, not called for by the terms of his contract, that would be of material advantage to both parties. Hence the proffer of personal assistance in the plaintiff's letter. But the words "personal assistance in every way," either standing alone or in connection with the exhibits and other evidence in the record, would not in our opinion support the conclusion of a jury that the plaintiff intended by that statement to indicate a general unlawful purpose, or a specific intent to exercise improper solicitation, or illegal personal influence, in behalf of Smyth Bros. with representatives of foreign governments.

"An intention to violate law or morals is not to be presumed." *Bergen* v. *Frisbie,* 125 Cal. 168, 57 Pac. 784.

"The law does not presume that parties to a contract intend by it to accomplish an illegal object, but it rather presumes that they intended to accomplish a legal purpose." Elliott on Contracts, section 1065.

[17] The law will not presume, unless it is forced to do so, that a person intends to do an illegal act. It will not therefore presume that the parties intended to make an illegal contract. *Richards* v. *Weiner Co.,* 207 N. Y. 59, 100 N. E. 592, affirming 145 App. Div. 353, 129 N. Y. Supp. 951.

"As tending to indicate the immorality of a contract the contingent character of the fee works no such result." *Bergen* v. *Frisbie, supra,* 125 Cal. p. 786, 57 Pac. 784.

In view of these citations, affording the appropriate rule of interpretation for an instrument sought to be impressed

with the implication of an unlawful purpose, the language of the plaintiff's letter, cited *supra,* was properly construed to express an innocent intent.

"As was said in *Brightman* v. *Bates, supra,* the question before us is not whether or not it would be possible to carry out the contract in a way which would have made the contract bad, if specified in it, but whether it was impossible to carry out the contract in a way which might lawfully have been specified in advance." *Carnegie* v. *Security Trust Co.,* 111 Va. 1, 68 S. E. 412, 31 L. R. A. (N. S.) 1186, 21 Ann. Cas. 1287.

It was the duty of the court to determine whether there was evidence to support the instruction under consideration, and if in its judgment that evidence was lacking, to reject it. In the opinion of this court, neither the extracts from the record, cited *supra,* by the defendants, nor anything else contained in the record, support the conclusion of fact that the "plaintiff would among other things, for a contingent compensation, exert his personal influence with an inspector, or inspectors, of the French or Belgian governments to secure the acceptance by them of the artillery and cavalry horses which it was contemplated would be offered for sale to said governments by the defendants for war purposes."

Hence the instruction was properly rejected.

[18] The plaintiffs in error approve of the abolition of the scintilla doctrine, but insist that "the other extreme is equally to be avoided, that of permitting trial courts, in effect, themselves to decide questions of fact." But that is precisely what the courts are measurably compelled to do in applying the rule announced in *C. & O. Ry. Co.* v. *Stock, supra.* Unless the trial courts can pass on the evidence to the extent of ascertaining whether there is sufficient evidence to justify an instruction, then the abolition of the scintilla doctrine has not been effected.

"Indeed, whenever an instruction is offered, it is the duty of the court to consider whether there is evidence to support

it, and if there be none, to refuse it on this ground, however sound it may be as an abstract proposition of law." *Norfolk Southern Ry. Co.* v. *Norfolk Truckers' Exchange,* 118 Va. 656, 88 S. E. 320.

Instruction No. 2, prayed by the defendants, requested the court to instruct the jury that if they believed from the evidence that the contract between the plaintiff and the defendants for a commission of five dollars per horse "was, because of the disproportion of the commission to the real value of the services alleged to have been rendered to the defendants by the plaintiff, in introducing them to Kelham, or for any other reason, excessive, extortionate and unconscionable, then the said contract was void to the extent of the excess over a fair and reasonable compensation for said service, the amount of which the jury may determine from the evidence." This instruction was asked to be read in connection with instructions 3 and 4.

There are several valid objections to this instruction, which was rejected by the trial court.

[19] First. The instruction was objectionable on account of the sweeping and indefinite authority given to the jury to avoid the agreement of the parties (an agreement between "grown-ups"), on the ground that it was "excessive, extortionate and unconscionable, by reason of the disproportion of the value of the services to the agreed compensation," *"or for any other reason."*

[20] Second. The direction to the jury to consider the instruction in connection with instructions three and four was improper. Instruction No. 3 was upon a totally different subject, and the direction to the jury to consider it in connection with the authority given by No. 2 would have been confusing and misleading.

[21] Third. The contract was erroneously stated. It was not a contract for a compensation of five dollars upon each horse sold to Kelham, in consideration of the introduction by Beresford of the defendants to Kelham. It nowhere

appears in the evidence that Beresford made a charge for introducing the defendants to Kelham. Smyth Bros. paid other parties for an introduction to Beresford, and such was their eagerness to secure contracts, that they appear to have been willing to pay an extravagant sum for an introduction to the plaintiff, on the bare chance that such an introduction would be profitable to them. But Beresford's contract, whether in the terms stated by Beresford or in those stated by the defendants, did not provide for compensation for an introduction to the agent of Dalton, Parsons and Company. Speaking of the contract, T. A. Smyth, one of the defendants, says that "Beresford had a flat rate of five dollars to give us all the assistance that he could." The plaintiff states that the agreement was that "if he could sell horses for them (*i. e.,* the defendants), they would pay him five dollars a horse, with a super-commission of $2.50 a horse for light horses, on all horses sold to Harold E. Kelham, or his principals, Dalton, Parsons and Company."

[22, 23] Fourth. It was error to devolve the determination of a mixed question of law and fact upon the jury without sufficient instructions as to the law. There is no evidence upon the reasonableness, or unreasonableness, of the commissions agreed upon. Indeed the defendants seem to admit that no evidence could have been introduced as to the adequacy of the compensation fixed for the brokerage services of the plaintiff. Whatever was the bargain between the parties (and the determination of its terms was remitted to the jury), it grew out of a situation in which intelligence and experience met intelligence and experience, and a mutual understanding followed. The defendants sought out Beresford—indeed, paid handsomely for an introduction to him—and in the negotiations which ensued agreed upon a compensation of five dollars a head on all horses sold to Dalton, Parsons and Company. Beresford was to do certain things, and in consideration of those services, the fee of five dollars per horse was to be paid

to him. Both parties anticipated profit from the arrangement, and if in the result it was more profitable to one party than to the other, that fact furnished no reason for avoiding the contract in whole or in part. One thing is very clear from the testimony of the defendants, and that is that after the arrangement with Beresford was made, they sold to Kelham 20,936 horses, and became well established in the export business of selling horses for war purposes. The aggregate value of these sales was very great, the value of the horses sold to Kelham alone amounting to something like $3,500,000. Hence the defendants could hardly say that there was no consideration for the amount agreed to be paid to the plaintiff.

[24] The general principle of law appropriate to this situation is well stated by Elliott: "While the courts refuse to give effect to a contract not supported by the consideration, and insist that the consideration must be something of value in the eyes of the law, yet it need not be adequate. Courts do not inquire into the proportionate value of the thing received; that is for the parties to settle. If the parties get that which they bargained for, and were not acting under fraud, mistake, or the like, the courts do not concern themselves with the relative values exchanged, or the wisdom of the contract. This general doctrine is applied and illustrated in a multitude of cases. The promisor will not be heard to say that that which he contracted for was of no value, in case he has received the benefit of it, and would not have been entitled to such benefit except for the contract." Elliott on Contracts, sec. 209.

"Where parties agree upon a consideration, and it is one of indeterminate value, the courts will not substitute their judgment for that of the contracting parties, but will uphold the contract." *First Nat. Bank of Peoria, etc.* v. *Farmers & Merchants Nat. Bank, etc.*, 171 Ind. 323, 86 N. E. 417.

It is not the propriety or the impropriety of a disposi-

tion of property, but the capacity to make it, and the fact that it was freely made, with the full assent of the grantor, and that must control the judgment of the court. *Greer* v. *Greer*, 50 Va. (9 Gratt.) 330.

When parties are competent to contract, relief will not be decreed on the ground of inadequacy of consideration, unless the inequality be so gross as to shock the conscience, and of itself amount to proof of fraud. *Jones* v. *Degge*, 84 Va. 691, 5 S. E. 799.

"Cancelling an executed contract is an exertion of the most extraordinary power of a court of equity. The power ought not to be exercised except in a clear case." *Atlantic Delaine Co.* v. *James*, 94 U. S. 214, 24 L. Ed. 112.

"Courts of equity, as well as courts of law," says Judge Story, "act upon the ground that every person who is not from his peculiar condition or circumstances under disability is entitled to dispose of his property, in such manner and upon such terms as he chooses, and whether his bargains are wise, or discreet, or profitable, or unprofitable, or otherwise, are considerations not for courts of justice, but for the party himself to deliberate upon." 1 Story's Eq., section 244.

Certainly, in dealing with Beresford, Smyth Bros. and their associates were not by reason of any peculiar condition or circumstances under disability.

[25] While the jurisdiction undoubtedly exists in the courts to avoid a contract on the ground that it makes an unconscionable bargain, nevertheless an inequitable and unconscionable bargain has been defined to be "one that no man in his senses and not under a delusion would make, on the one hand, and as no fair man would accept, on the other." The inequality must be so gross as to shock the conscience. This cannot be said of the agreement in the instant case.

At this point the remarks of Judge Riely, in the case of *Banner* v. *Rosser*, 96 Va. 250-1, 31 S. E. 71, 72, are perti-

nent: "The further objection was made that the agreement. was unconscionable. * * * Can it be said that he acted. unwisely, or that his conduct was not that of a prudent business man? But whether wise, or unwise, the agreement in view of the testimony that he had the capacity to make it, and that it was his own free, voluntary act, cannot. be impeached, however unreasonable or imprudent it may now seem to others."

The instruction tendered, even if it was considered to be proper in other respects, did not sufficiently advise the jury as to what is required to avoid a contract on the ground of unconscionableness, but allowed them by necessary implication to reach the conclusion that the contract was unconscionable for any reason that seemed good to them. The instruction was properly refused.

The proposition of law stated in instruction F, given by the court, is so plainly right that comment is unnecessary.

[26] Plaintiffs in error insist most earnestly that instruction No. 3, tendered by them and refused, should have been given. This instruction raises the question of split. commissions, which is discussed very elaborately and with much citation of authorities in the petition.

After stating the law of the relation between principal and agent, this instruction concludes as follows: "The court instructs the jury that Harold E. Kelham, the agent of the purchasers, Dalton, Parsons and Company, had no right to receive a commission or other compensation from the sellers of the horses, for a commission upon the sale of which this action was instituted, and if the jury believe from the evidence that the plaintiff, Beresford, was an 'associate' of said Kelham in said transaction, and received a part of the commission paid Kelham by the defendants, the jury should find for the defendants."

It appears from the sworn answers of T. A. Smyth, one of the defendants, to interrogatories propounded by the

plaintiff and from the tables of shipments and prices filed with these answers: First, that the defendants did pay Kelham commissions on horses sold him for his principals, Dalton, Parsons and Company; Second, that these commissions were first paid on July 3, 1916; and Third, that on July 5, 1915, the prices paid Smyth Bros. for their horses were advanced.

The conduct of the parties engaged in these transactions was so obviously improper that comment is unnecessary. Having in mind that the defendants, so far as they could do so, terminated the last contract, which they alleged was made with Beresford, many months before they began to pay Kelham commissions on horses sold him for his principal, it is doubtful whether upon such a state of facts they would be entitled to have the jury instructed to find in their favor, even if there had been a subsequent division between Beresford and Kelham of these commissions. But there is no evidence whatever that such a division took place. Plaintiffs in error insist that the instruction should have been given, because in their view it is established that Kelham and Beresford split commissions in another case, in which Smyth Bros. were not concerned. This reference is to the Crouch Mule Agency case, which is very extensively discussed in the petition of the plaintiffs in error. This case was brought into the record on the cross-examination of Beresford, who was asked if he did not receive a commission on some horses sold by the above agency to Kelham for Dalton, Parsons and Company, and further if he did not split the commissions on this sale with Kelham. Beresford admitted that he had received commissions in the above connection, but vehemently denied that he split his commissions with Kelham. The witness was cross-examined very elaborately and minutely on this line, and was confronted with checks which the plaintiffs in error regard as establishing the contention that the commissions paid were split

between Beresford and Kelham. This was a matter purely collateral to the inquiry in the instant case. Beresford could be cross-examined on this line, and confronted with checks and other papers, with a view to reducing his credibility with the jury. But when the witness had denied that he had been guilty of a disgraceful act in a proceeding in no wise related to his claim against the defendants, the defendants were not at liberty to undertake to establish affirmatively that as a matter of fact, in spite of his denials, Beresford did split his commissions with Kelham in the Crouch Mule Agency case. Even conceding that he did split commissions with Kelham in that instance, this fact would not establish the contention that Kelham divided with him the commissions received by the latter from Smyth Bros. beginning with July 3, 1915, and continuing through that year. The commissions paid by the defendants to Kelham were paid after the severance of personal relations between the plaintiff and Smyth Bros. There is nothing whatever in the record to show that during this period there were any business transactions between Kelham and Beresford, much less a division of the commissions received by the former from Smyth Bros. For lack of evidence to support it, this instruction was properly refused by the trial court.

[27] Plaintiffs in error complain that the instructions given by the court gave undue weight to the evidence tending to prove that the compensation agreed upon between the plaintiff and the defendants was five dollars per horse, and that they entirely ignored evidence going to show another basis of compensation.

We do not consider that the instructions given are properly obnoxious to this criticism. Instruction B relates to the alleged five dollars per horse contract, but it in no wise gives undue weight or prominence to the evidence relied upon by the plaintiff to establish this contract. This in-

struction is in proper form, and was proper to be given from the view point of the plaintiff's contention. In lieu of merely excepting to this instruction, the defendants might have submitted an amendment to the same, or a companion instruction to the like effect from the defendants' view point. This course the defendants do not appear to have pursued. There was no error on the part of the court in giving this instruction, which instructs the jury to find for the plaintiff should they arrive at certain conclusions from the evidence, correctly giving in the same connection the principles of the plaintiff's recovery.

Instruction G remits to the jury the determination of whether or not a contract was made between the parties, and the terms of that contract, if it was concluded that one had been made. Further, the jury were told to determine whether any contract made by the parties was modified by mutual consent, and if made and modified, whether by mutual consent it was subsequently abandoned. The jury were advised in this instruction that it was exclusively within their province "to determine the facts to be deduced from the evidence in the case." In view of this instruction, the jury could not have been in any doubt as to their authority to find in favor of the five-dollar contract, the one-dollar contract, or for the defendants on the merits. The burden resting upon the plaintiff to establish his right of recovery was also correctly stated in this instruction. There was no error in this instruction. As to the complaint that the trial court did not instruct, or even intimate to the jury, that if they believed from the evidence that the plaintiff agreed to reduce his commissions to one dollar per horse, the verdict should be for the plaintiff in a corresponding sum, it may be said that the defendants did not ask for such an instruction. On the contrary, they asked for an instruction that if the jury believed from the evidence that the five-dollar contract was changed to a one-dollar contract by the parties, they should find for the defendants.

The jury were sufficiently advised by the instructions given as to what their verdict should be, in the event they believed that the five-dollar contract was substituted by the alleged one-dollar contract. Having been instructed that they could find the one-dollar contract, if they believed that the evidence was to that effect, and that they should apply the law enunciated by the court in the instructions, to their conclusions, the jury very naturally would have applied the same principles, *mutatis mutandis*, to a verdict ascertaining a commission of one dollar per horse sold that they had been directed to apply to a verdict finding a commission of five dollars per horse. Surely something must be conceded to the intelligence of the jury and their capacity to make practical application of the clear and explicit instructions given in this case.

[28] The last assignment of error is to the action of the court in overruling the motion to set aside the verdict, on the ground that it was contrary to the law and the evidence. This case was submitted to the jury on all questions of fact, and they were fully and properly instructed on all necessary questions of law by the learned trial judge. The verdict indicates that they gave credence, as they had the undisputed right to do, to the oral and other testimony for the plaintiff. According to the familiar and oft enunciated principles, this court is bound by the verdict reached by a jury upon consideration of disputed facts. Assuredly, in this case we are very far from being able to say that the verdict is without evidence to support it.

We find no error in the judgment of the Law and Equity Court of the city of Richmond, and that judgment is affirmed.

*Affirmed.*