# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-2054

_____

In re: David L. Juve, doing business as Juve Buying Services, doing business as Imports Plus, Inc.; Mona L. Juve

*Debtor*s

------------------------------

David H. Heide

*Appellant*

Leah T. Heide; Kaia E. Heide

v.

David L. Juve, doing business as Juve Buying Services, doing business as Imports Plus, Inc.

*Appellee*

Mona L. Juve

_____

Appeal from the United States Bankruptcy
Appellate Panel for the Eighth Circuit

_____

Submitted: February 12, 2014
Filed: July 31, 2014

_____

Before SMITH, BEAM, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

David Juve filed for Chapter 7 bankruptcy in August 2009. In December 2009, Juve's former business associate, David Heide, challenged certain debts Juve owed to Heide as nondischargeable. The debts arose from a decade-long agreement between Heide and Juve. Heide periodically loaned Juve money to purchase inventory for the used car dealership that Juve partially owned in Minnesota. Heide asserted that Juve obtained—and lost—more than $300,000 in loans by false representation and that the debt was therefore nondischargeble. After a bench trial, the bankruptcy court agreed and found that the debt was nondischargeable under 11 U.S.C § 523(a)(2)(A). The Bankruptcy Appellate Panel (BAP) found that the bankruptcy court clearly erred in its factual findings and reversed. We reverse the BAP and direct reinstatement of the bankruptcy court's judgment.

## I. *Background*

During the 1990s and 2000s, Juve sold used cars. During the time relevant to this appeal, Juve worked at the Imports Plus used car dealership. In 1996, Heide began working for Juve at Imports Plus. The two had previously worked together as salesmen at a different dealership and had developed a good friendship.

Because of a prior bankruptcy, Juve lacked a sufficient credit rating to obtain traditional financing for car purchases. In 1998, Juve asked Heide to help fund the purchase of vehicles for resale on the Imports Plus lot. Heide agreed and began lending Juve just enough money to purchase one vehicle for resale at a time. Juve paid Heide regular interest payments until the car was sold; additionally, he received a 10 percent return on his investment upon sale.

In 2001, Juve became 75 percent owner of Imports Plus. In need of capital, he asked Heide to modify their agreement. Under the modified agreement, Heide would fund the purchase of multiple cars at a time, receive monthly interest payments, and receive a commission when each car was sold. The proceeds of the sale would be rolled into the purchase of the next car rather than being used to pay down the principal of the loan, which amounted to $200,000. Heide disbursed two $50,000 loans to Juve in 2003 and 2004, bringing the loan balance to $300,000. The checks were written to Imports Plus, Inc. It is undisputed that Juve repeatedly reassured Heide that Juve owned the cars on the lot and that the inventory was sufficient to secure the loan.

In 2005, Heide asked Juve to keep vehicle titles at Imports Plus so that customers could obtain title to their purchases more quickly. Juve claimed that he wanted to keep them at his home in case of a fire at Imports Plus. During that time, Heide recommended that Juve take out a life insurance policy naming Heide as beneficiary; Juve told Heide that he had done so. In 2006, Imports Plus began to fail. By 2007, Juve encumbered the titles of several vehicles on the lot, without telling Heide. At length, Imports Plus lost all of Heide's investment. Juve could not explain how exactly the funds were lost.

In 2008, Juve approached Heide about purchasing specific vehicles at an auction in Las Vegas. Heide agreed and wrote two checks for a total of $50,490; the checks identified the vehicles to be purchased. Juve traveled to Las Vegas, returned, then told Heide he had purchased the vehicles. In fact, Juve did not purchase the cars. By the end of 2008, the business further deteriorated: the Las Vegas vehicles had not arrived at the Imports Plus lot, Imports Plus customers were not receiving vehicle titles, and Juve had cleaned out his office. Heide then requested repayment of part of the loan; Juve declined claiming the timing was not good.

-3-

Concerned about Imports Plus viability, Heide traveled to Florida to meet with Juve's business co-owner, Dennis Borgen. Borgen was the prior owner of Imports Plus and retained 25 percent ownership. At that meeting, Heide for the first time revealed to Borgen the decade-long course of dealing between Juve and Heide. Borgen called Juve to discuss the situation, whereupon Juve admitted that he had lost all of Heide's money and had lied about it for some time.

In January 2009, Heide met with Juve and accused Juve of stealing his life savings. Juve insisted that it had not been intentional and maintained that he intended to repay the debt. Heide asked about the life insurance policy; Juve then revealed that he never purchased the policy. At Heide's insistence, Juve signed a document stating that he had borrowed $300,000 from Heide and paid interest without interruption during the life of the loan. The document also acknowledged the Las Vegas transaction and Juve's failure to follow through with the purchase of the vehicles. Finally, the document acknowledged that Juve was personally liable for the loans.

Juve and his wife filed for Chapter 7 bankruptcy in August 2009. Heide and his wife commenced an adversary proceeding against the Juves, seeking a declaration that the debts were nondischargeable under 11 U.S.C §§ 523(a)(2), (4), or (6). The Heides moved for summary judgment, which the bankruptcy court granted. The court found that Juve owed Heide $400,000, which included the debts described above and a $50,000 loan to the Juves from Heide's daughter. The court also found that the debt was nondischargeable under 11 U.S.C § 523(a)(2)(A).

Juve appealed to the BAP, which reversed and remanded to the bankruptcy court. On remand, the case proceeded to a bench trial, whereupon the court entered judgment for the Heides for $359,490—the value of the loan acknowledged in the 2009 document plus the Las Vegas transaction. The court found that Juve had engaged in fraud through his repeated representations that Heide's investment was safe. The court also found that following the 2001 restructuring of the loan

agreement, each new purchase of a car with the loan constituted a re-extension of credit.

Juve again appealed to the BAP, which again reversed the bankruptcy court. The BAP held that the bankruptcy court clearly erred in its factual findings. The BAP held that the reuse of loan funds for the purchase of new cars did not constitute a re-extension of credit. The BAP further held that the record did not support finding that Heide made fraudulent representations with respect to security of the loans at the time the loans originated in 2004 (when Heide disbursed the last of the loan funds). The BAP therefore reversed the judgment as to the $300,000 loan. The BAP considered the Las Vegas car-purchase loan a separate transaction and affirmed judgment against Juve as to that $50,490 loan. This appeal followed.

## II. *Discussion*

"In an appeal from the BAP, this court independently reviews the bankruptcy court's decision . . . Fact findings by the bankruptcy court are reviewed for clear error; its conclusions of law are reviewed de novo." *Terry v. Standard Ins. Co.* (*In re Terry*), 687 F.3d 961, 963 (8th Cir. 2012) (internal citation omitted). The Supreme Court described the "clear error" standard as follows:

> A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985) (citations, quotations, and alterations omitted).[1]

The bankruptcy code designates some debts as nondischargeable in bankruptcy. One class of nondischargeable debt is any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).

The creditor bears the burden of proving, by a preponderance of the evidence, that a debt should be nondischargeable under § 523. *See Grogan v. Garner*, 498 U.S. 279, 286–87 (1991); *Treadwell v. Glenstone Lodge, Inc.* (*In re Treadwell*), 637 F.3d 855, 860 (8th Cir. 2011). The creditor must show that "(1) the debtor made a representation, (2) with knowledge of its falsity, (3) deliberately for the purpose of deceiving the creditor, (4) who justifiably relied on the representation, which (5) proximately caused the creditor damage." *Treadwell*, 657 F.3d at 860. A debtor's silence as to a material fact can constitute a false representation under § 523(a)(2)(A). *Caspers v. Van Horne* (*Matter of Van Horne*), 823 F.2d 1285, 1288 (8th Cir. 1987), *abrogated on other grounds by Grogan*, 498 U.S. 279. Juve does not challenge the bankruptcy court's calculation of Heide's damages.

> Justifiable reliance is an intermediate standard between actual reliance and reasonable reliance. *See Field* [*v. Mann*], 516 U.S. [59,] 70–73. Reliance can be justifiable even though an investigation would have revealed the falsity of a representation. *Id.* at 74–75. However, a creditor "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to

---

[1]We have applied the *Anderson* standard to review of bankruptcy court factfinding. *See R & R Ready Mix v. Freier* (*In re Freier*), 604 F.3d 583, 587 (8th Cir. 2010).

-6-

make a cursory examination or investigation." *Id.* at 71 (quoting Restatement (Second) of Torts § 541 cmt. a (1976)).

*In re Freier*, 604 F.3d at 588.[2]

The primary question before us is whether the bankruptcy court clearly erred in finding that Juve's reuse of loan funds after 2004 constituted an "extension [or] renewal . . . of credit" under §523(a)(2)(A). If the reuse of funds after 2004 constituted such an extension or renewal, then the entire debt is rendered nondischargeable upon proof that the extension was obtained by fraud and satisfaction of the *Treadwell* elements. The bankruptcy court characterized the loan arrangement as follows:

> In 2003 and 2004, Heide disbursed two more $50,000 loans to Juve, in addition to the revolving ongoing extension of credit based on previously loaned amounts, bringing the total amount of outstanding debt owed by Juve to Heide to $300,000. Juve continued to use that money through 2008. In other words, as Heide vehicles were sold, instead of being repaid the principal as was his right at any time, Heide re-extended the credit and use of the proceeds to Juve, and Juve repeatedly borrowed those funds anew, all based upon Juve's ongoing assertions of the equity and liquidity of the Heide inventory sufficient to satisfy the entire balance of funds owning to Heide.

---

[2] Juve contends that "justifiable reliance" requires proof that there were no "red flags" that would alert an "ordinary prudent investor" that the representations were inaccurate, and that "minimal investigation" would have revealed the falsity of the representation. *Helena Chem. Co. v. Richmond* (*In re Richmond*), 429 B.R. 263, 293 (Bkrtcy. E.D. Ark. 2010). *Richmond* is inapposite, as the *Richmond* court was construing "reasonable reliance" found in 11 U.S.C. § 523(a)(2)(B). As we held in *Freier*, "justifiable reliance" is a lower standard than "reasonable reliance."

The BAP concluded that "[t]he record does not support [the bankruptcy court's] finding" because "Heide himself never testified that under the terms of the modified oral agreement each use of the loan proceeds constituted a renewal of credit." We disagree. Both Heide and Juve testified that the loan proceeds constituted a "revolving account" for the purchase of new vehicles.[3] The parties agree that Heide loaned a substantial sum to Juve. Between 2004 and 2009, Juve used and reused the funds while Heide did not demand repayment. Failure to use the magic words "renewal of credit" to describe the agreement is not dispositive. In light of the record evidence, we hold that the bankruptcy court's factual determination is plausible and a "permissible view[ ] of the evidence;" therefore, it did not clearly err. *See Anderson*, 470 U.S. at 473–74.

The court did not clearly err in its *Treadwell* elements factual findings.[4] First, Juve made representations. Juve told Heide that his investment was "safe" and that he had secured a life insurance policy with Heide as beneficiary to protect the investment. Juve told Heide that all of the cars on the lot belonged to Heide, but he did not disclose that he was encumbering the vehicles. Silence as to a material fact can constitute a false representation. *See Van Horne*, 823 F.2d at 1288.

Second, Juve knew that some of his representations were false and that the representations were made with the purpose to deceive Heide. Juve admitted at trial that he knew that selling vehicles would be the only way for Heide to get his money back. He encumbered the vehicles anyway and admitted that by 2007 and 2008, "there wasn't $300,000 of unencumbered inventory on the Imports Plus lot." Juve was

---

[3]Heide testified at trial that "the money was—it was in his revolving account to pay for new purchases." App. at 131. Juve testified that Heide "gave another $13,000 to just turn it all over into a revolving account for $200,000 so he'd get a monthly check." *Id.* at 224.

[4]The damage element is not disputed here.

obviously aware that he had not secured a life insurance policy naming Heide as beneficiary. He nevertheless continued to represent to Heide that Heide owned all the vehicles on the lot and that Heide's investment was safe.

Third, Heide "justifiably relied" on Juve's representations. Juve took advantage of his friendship with Heide. Juve was not a stranger but a friend who misused the trust associated with their relationship. Juve concealed his misrepresentation of the security of Heide's investment by making periodic interest payments while fully aware that he was squandering Heide's property. When Heide began to have misgivings about the security of the loan and suggested that Juve secure a life insurance policy, Juve falsely assured him that he had done so. Juve even concealed from his joint owner, Borgen, Heide's loans and Juve's encumbering of the vehicles. On this record, we hold that the bankruptcy court did not clearly err in finding that Heide justifiably relied on Juve's representations.

The bankruptcy court's factual findings were not clearly erroneous in light of the record evidence produced by a full trial on the merits. Nor did the court erroneously apply the law to the facts presented. The bankruptcy court's judgment should be reinstated.

### III. *Conclusion*

Accordingly, we reverse the judgment of the BAP and remand to the BAP with instructions to remand to the bankruptcy court for entry of judgment in favor of Heide.

_____