# United States Bankruptcy Appellate Panel

## For the Eighth Circuit

_____

No. 14-6032

_____

In re: Michael Aubrey Walker, also known as Mike Aubrey Walker

*Debtor*

------------------------------

Joseph R. Wilson

*Plaintiff - Appellant*

v.

Michael Aubrey Walker; Tamar Walker; Precious Princess Productions, LLC

*Defendants - Appellees*

_____

Appeal from United States Bankruptcy Court
for the Western District of Missouri - Springfield

_____

Submitted: February 25, 2015
Filed: April 7, 2015

_____

Before KRESSEL, SCHERMER and NAIL, Bankruptcy Judges.

_____

SCHERMER, Bankruptcy Judge

Joseph R. Wilson (Wilson) appeals the bankruptcy court's[1] rulings denying his: (1) requests for: (a) a judgment of nondischargeability under 11 U.S.C. § 523 against Michael Aubrey Walker (Debtor), together with a money judgment, and (b) enforcement of a money judgment against Debtor's non-filing spouse or her company; (2) request for denial of the Debtor's discharge under 11 U.S.C. § 727; and (3) motions to alter or amend the judgment and for a new trial and making additional findings of fact. We have jurisdiction over this appeal. *See* 28 U.S.C. § 158(b). For the reasons that follow, we affirm.

## ISSUES

This appeal concerns Wilson's assertions that debt owed to him by the Debtor should be excepted from the Debtor's discharge under § 523 of Title 11 of the United States Code (Bankruptcy Code) or the Debtor's discharge should be denied under Bankruptcy Code § 727. Therefore, we consider whether the Debtor owes a debt to Wilson. To determine whether a debt exists, we must decide whether: (1) two contracts between the Debtor and Wilson were void as unconscionable; (2) Wilson lost an investment he made in the Debtor or his career; and (3) Wilson has asserted any other basis for a debt. We consider Wilson's arguments that: (1) the Debtor waived an unconscionability argument for failure to raise it as an affirmative defense; and (2) assertion of unconscionability is barred by the Virginia statute of limitations. In addition, we consider the propriety of the bankruptcy court's ruling that the Debtor's discharge should not be denied under §§ 727(a)(2), (a)(3) and (a)(4). We hold that there is no basis upon which to rule that the Debtor owed a debt to Wilson. The bankruptcy court properly decided that Wilson had no cause of action under §523. Likewise, there was no basis upon which to deny the Debtor's discharge under § 727.

---

[1] The Honorable Arthur B. Federman, Chief Judge, United States Bankruptcy Court for the Western District of Missouri.

## BACKGROUND

The bankruptcy court made extensive factual findings in its written decisions. Those findings were supported by the record, and we see no error with them. Therefore, where practical, we set forth the findings relevant to our decision in a summary fashion.

The Debtor and Wilson first met in 2002 while the Debtor was performing in Nashville, Tennessee. The Debtor was only twenty-six years-old, while Wilson was approximately forty-five years-old. When the two men met, the Debtor had been working as a karaoke singer and an impressionist. It is undisputed that the Debtor is a talented singer.

In late 2003 or early 2004, Wilson agreed (verbally) to help manage the Debtor's career. Wilson agreed to provide advice, counsel and funds to help with the Debtor's career.

## The written Artist Management Agreements

The parties continued to work together, but they did not enter into their first of three written agreement until 2005. The bankruptcy court found that the Debtor and Wilson acted through a sole proprietorship arrangement, not as a partnership as the Debtor believed was intended. Wilson had registered "W&W Enterprises" (W&W) as a fictitious name with the Missouri Secretary of State. The bankruptcy court found that Wilson acted as the Debtor's manager in the name of W&W, a sole proprietorship of Wilson who was effectively the employer and the Debtor was the employee.

In April 2005, Wilson retained an attorney to draft the first Artist Management Agreement (2005 AMA). The 2005 AMA obligated Wilson to advise and counsel the Debtor in all matters concerning development of his act, publicizing himself,

selection of venues, and terms of contracts. Notwithstanding the obligations taken on by Wilson, Wilson was inexperienced in the area. Previously he had worked in the wallpaper business and then in construction where he was a business owner and operator. Before Wilson met the Debtor, he had only managed a couple of music acts.

The 2005 AMA had a three-year term, with an option for Wilson to renew the agreement for four one-year terms. Therefore, the total term of the agreement could reach seven years at Wilson's option. The 2005 AMA obligated the Debtor to pay Wilson fees of 15% of the Debtor's gross compensation and publishing revenue, and 25% of voice impression work performed by the Debtor. An individual or corporation could buy out the right to manage the Debtor's affairs for $2 million. Under the 2005 AMA, the Debtor had the option to terminate the agreement upon thirty days written notice if Wilson was not able to personally render services.

The parties entered into two subsequent Artist Management Agreements (AMAs). Like the 2005 AMA, these agreements obligated Wilson to advise and counsel the Debtor in all matters concerning development of his act, publicizing himself, selection of venues, and terms of contracts. Each of these subsequent AMAs was drafted by Wilson without the advice of counsel. According to Wilson, he used the 2005 AMA as a template for the later AMAs. The changes from the 2005 AMA were drastic.

On April 30, 2007, the Debtor and Wilson entered into a new Artist Management Agreement (2007 AMA). The 2007 AMA was for a twenty-year term with four two-year extension options exercisable only by Wilson. At Wilson's option, the total term of the agreement could now reach twenty-eight years. Wilson had the Debtor initial the paragraph extending the agreements term. Under this new agreement, the Debtor was now obligated to pay Wilson a fee of 25% on all receipts. The buyout cost for another organization or individual was increased to $10 million.

4

And, Paragraph 10 of the 2007 AMA states that "[i]t is understood by ARTIST that MANAGER cannot be replaced or fired for any reasons or circumstances during this … Agreement, exception [*sic*] specified in paragraph (12)." The Debtor was allowed to purchase the remainder of the twenty-year term for $8 million. In turn, Paragraph 12 provided a cure period for any claimed breach. If there was no cure, Paragraph 12 also stated that "[i]n the event of any dispute under or relating to the terms of this Agreement, or breach thereof, it is agreed that the same shall be submitted for arbitration to the American Arbitration Association ("AAA") in the State of Virginia." The provision from the 2005 AMA allowing the Debtor to terminate on thirty days written notice if Wilson was unable to perform was removed. Now, the 2007 AMA stated:

> If MANAGER is not personally available to render the services of MANAGER as described herein (except for limited periods not to exceed one hundred eighty (180) days because of illness), MANAGER will have the right to secure temporary replacement management for the remaining period of this Agreement.

A year later, the parties also signed a new Artist Management Agreement on April 28, 2008 (2008 AMA). Wilson contends that changes he made to the 2008 AMA were made at the Debtor's request. The bankruptcy court found this to be lacking in credibility. The 2008 AMA stated that the term was "for a period of time twenty (25) [*sic*] years." Wilson exclusively had the option to extend the term for four periods of two years (eight years total).[2] Under this new agreement, Wilson's compensation was increased to 50% of Walker's gross revenues. Paragraph 10 of the 2007 AMA stating that Wilson could not be replaced or fired for any reason stayed as part of the 2008 AMA. However, the provision in the 2007 AMA that allowed the Debtor to buy out the remaining term of Wilson's contract was removed. The

---

[2] Discussing the internal inconsistency in the document, the bankruptcy court appropriately held that whether the term was twenty-five years with eight years of options, or twenty years with eight years of options, it was unreasonable.

provisions in Paragraph 12 of the 2007 AMA concerning a cure for any claimed breach and the submission of disputes to arbitration in Virginia remained in the 2008 AMA. Wilson retained the right to secure a replacement manager for the balance of the agreement's term if Walker should become unavailable to perform. In addition, the 2008 AMA added a new term stating:

> In the event MANAGER pass's [*sic*] away, ARTIST will allow MANAGER'S benefactor the right to hire at benefactor['s] cost, a replacement MANAGER (ACCEPTABLE TO ARTIST) for the remainder period of contract with no options. Payments will be paid at same existing rate to benefactor and will be paid monthly by ARTIST or new MANAGER less MANAGERS['s] prior arranged fee from benefactor with a detailed account of monthly receipts.

The bankruptcy court found that this: (1) appears to require the Debtor to pay the benefactor the same payment the Debtor would have paid to Wilson, even if the benefactor did not obtain an acceptable replacement, and that, (2) if the benefactor obtained a replacement who was compensated at a lesser rate, the benefactor would receive the difference.

Under all three AMAs, the Debtor was solely responsible for his expenses. The AMAs expressly stated that Wilson had no liability for such expenses. In addition, under all three AMAs, the Debtor was only to work at such times and places as were approved in writing by Wilson.

**The Mickey Gilley Theater deal and Al Embry agreement**

In July 2006, Wilson signed, on behalf of the Debtor, a two-year Exclusive Booking Agreement with Al Embry International, LLC. The agreement included a provision to extend its term for two years at Al Embry International, LLC's option.

On April 1, 2007, approximately one month before the parties entered into the

6

2007 AMA, Wilson signed a five-year Performance Agreement for the Debtor to perform at the Mickey Gilley Theater in Branson, Missouri. Under the arrangement with the Mickey Gilley Theater, the Debtor was given a time slot for his performance. From the ticket sales, the theater received a specified amount and the performer received the remaining balance. The Mickey Gilley Theater required a performer to pay his own expenses. Wilson testified that, notwithstanding a requirement in the 2007 AMA for the Debtor to pay his own expenses, Wilson paid the Debtor's expenses for performances at the Mickey Gilley Theater using borrowed funds. In addition, Wilson testified that the Debtor was paid a salary by W&W and was issued Form 1099's by W&W. Due to the success of the Debtor's show, in 2007 W&W paid all of its expenses and repaid all of its loans. The bankruptcy court observed that this meant that Wilson had no unrecovered investment for 2007.

**The Pigeon Forge deal**

Notwithstanding the five-year arrangement with the Mickey Gilley Theater, on March 21, 2008, Wilson signed a Letter of Intent with an entity called Smoky Mountain Entertainment, LLC (SMEC), to move the Debtor's act to Pigeon Forge, Tennessee. The Debtor testified that Wilson told him they needed to get out of Branson because no one liked Wilson there. The terms proposed under the Pigeon Forge opportunity were significantly more lucrative than those offered under the Mickey Gilley Theater deal. However, the Pigeon Forge agreement was contingent upon SMEC's closing on the purchase of property it intended to use as a performance venue. The move to Tennessee required the Debtor to breach his Mickey Gilley Theater contract. Although Wilson has argued that the Debtor and Wilson jointly made the decision to breach the Mickey Gilley Theater contract and move to Pigeon Forge, the bankruptcy court appropriately found that Wilson was responsible for this determination. The record also supports the court's finding that under the 2007 AMA, the Debtor could not perform anywhere without Wilson's approval.

7

Wilson did an inconsequential amount of meaningful research before proceeding with the Pigeon Forge deal. That proved to be a mistake.

Under the SMEC deal, SMEC was to pay the costs of lodging and provide the Debtor with a backup band and singers. With only the Letter of Intent in hand, Wilson and the Debtor moved to Pigeon Forge in May 2008 (just after the Debtor and Wilson had entered into the 2008 AMA), and started to incur those costs.

The same month, SMEC, W&W and the Debtor entered into an Artist Performance Agreement. That agreement refers to W&W and the Debtor collectively as the "Artist." The Artist Performance Agreement provided for the Debtor's performances to take place in the property that SMEC was to acquire and renovate. The agreement stated that, upon acquisition of the property, SMEC was to put the amount of $245,000 in an escrow account, for use in making payments to W&W during the first year of the contract. The bankruptcy court pointed out that the escrow account was of no real security because the account was controlled by SMEC. The sale of the property where the Debtor's performances were to take place never closed. Worse, SMEC never deposited the required funds into the escrow account.

Thereafter, Wilson signed an amendment to the SMEC agreement. The amendment allowed the Debtor's performances to be either in the property that was supposed to be acquired by SMEC (which was a 1,200-seat venue) or in another leased property. The Debtor's show ended up in a 200-seat venue, rather than in the previously contemplated 1,200-seat venue. SMEC failed to honor its obligations to make bi-weekly payments to Wilson and to pay Wilson's and the Debtor's living expenses, and it also did not reimburse the parties for band and lodging expenses.

The bankruptcy court pointed out that entering into the Pigeon Forge deal (based upon Wilson's decision to do so) was a poor decision not only due to the lack of Wilson's due diligence regarding the financial viability of the project and its

backer, but also because the consequence of doing so was not wise for him personally or for the Debtor's career. In fact, the bankruptcy court appropriately found that these poor management decisions by Wilson "had devastating effects on the Debtor's career."

The Pigeon Forge deal was short-lived. SMEC terminated the agreement effective July 18, 2008, which was soon after the Debtor started his Pigeon Forge performances. The bankruptcy court noted the disagreement of the parties regarding why SMEC terminated the contract. It also noted that SMEC's attorney stated in a newspaper comment (a comment that was later retracted as part of a settlement of litigation) that SMEC terminated the contract due to difficulty working with Wilson.

**The Don King deal**

After the SMEC agreement was terminated, the booking agent who had originally approached Wilson about moving the Debtor's act to Pigeon Forge arranged for the Debtor and Wilson to meet with the well-known producer Don King. This led to the Debtor's and Wilson's signing of an Entertainment Personal Management Agreement with Don King Productions (King). Under the Entertainment Personal Management Agreement, the Debtor hired King as his "Career Business Manager." The agreement defined King's role as "to supervise, guide, and direct [the Debtor's] professional career as an entertainer, individually, and to attend to and assist in all business arrangements in connection with [the Debtor's] career in entertainment." Wilson was a party to the contract as the Debtor's "Personal Business Manager." The term of the agreement was three years with one three-year extension period, unless either party notified the other that they did not want to extend the term. The compensation to King under the agreement was 50% of revenues. Wilson maintained that he was still entitled to 50% of whatever revenue was left for the Debtor.

No work (and, therefore, no revenues) came from the King deal. The parties disagree about the reason for this. The bankruptcy court noted Wilson's stated reason, pointing out an inconsistency in his testimony. The court relied on the Debtor's testimony, stating that a more plausible reason was because of actions taken by Wilson. The bankruptcy court acknowledges that the original contact with King resulted from one of Wilson's other contacts, but it found that Wilson's management style was the reason why the Debtor was unable to use the contact to benefit his career. The court also stated that opportunities such as this one existed in the first place because of the Debtor's talent.

**Debtor's return to Branson**

When it became clear the Debtor would not secure an engagement through the King deal, he returned to Branson seeking work. Wilson then threatened Mickey Gilley with a lawsuit if he engaged the Debtor directly and did not pay Wilson what he believed to be his share of the Debtor's earnings.

The Debtor then sent a September 15, 2008 email stating that he was terminating Wilson as his manager. Eleven days later, an attorney hired by the Debtor sent a letter notifying Wilson that the Debtor was terminating the 2008 AMA. Wilson responded (through his attorney) that the 2008 AMA could not be terminated and that any claim for breach had to be brought in a Virginia arbitration.

Thereafter, the Debtor worked mostly for tips, singing at a local mall. Since August 2009, the Debtor performed off and on at the God & Country Theatre. In addition, the Debtor sang at church and engaged in a small number of single performances. Wilson has contacted a number of the places where the Debtor has performed since 2009 threatening litigation if any of them did business with the Debtor without including Wilson. Wilson maintains that he is entitled to his 50% share under the 2008 AMA. In one instance, a booking for the Debtor to do a series

of performances in Cancun, Mexico was terminated after Wilson threatened a lawsuit.

## Tamar Walker and her companies

In August 2009, the Debtor's wife, Tamar Walker, set up a company called Precious Princess Productions, to manage the Debtor's performances and receive the funds from such performances. Tamar also set up performances for her own musical group through Precious Princess Productions. In 2012, Tamar created Unchained Productions LLC, a successor company to Precious Princess Productions. Income from the Debtor's performances and Tamar's own performances is funneled through Unchained Productions. Unchained Productions pays the Debtor $50 per show, the expenses from the Debtor's and Tamar's performances and the household living expenses for the Debtor and Tamar.

## Extension of funds to develop Debtor's career

Wilson maintains that, over the years, he spent significant funds toward developing the Debtor's career. In fact, Wilson claimed that one form of consideration for the 2008 AMA was that he gave up more than $100,000 that he had invested in the Debtor's career.

## Wilson's bankruptcy

On March 6, 2008, during the time when Wilson was managing the Debtor and decided to breach the Mickey Gilley Theater contract and move to Pigeon Forge, and less than two months before the parties executed the 2008 AMA, Wilson filed his own Chapter 7 bankruptcy petition in Tennessee. Contrary to his testimony regarding investing in the Debtor's career, Wilson listed on his schedules no amounts due to W&W, or claims against the Debtor. He did not list on his schedules any amounts owed to him under the AMAs or any other debt owed to him by the Debtor. The

11

docket from Wilson's bankruptcy case shows he obtained a Chapter 7 discharge.

## Debtor's bankruptcy case

The Debtor filed his Chapter 7 bankruptcy petition on July 30, 2012. In the Debtor's case, Wilson filed the adversary proceeding that is the subject of this appeal. Through the adversary proceeding, Wilson claimed that the debt owed to him under the 2008 AMA is excepted from the Debtor's discharge under § 523 of the Bankruptcy Code, together with the request for a money judgment, and that the Debtor's discharge should be denied under Bankruptcy Code § 727. Wilson also added Tamar Walker and Precious Princess Productions, LLC as defendants, seeking enforcement of any judgment against them jointly and severally. He sought recovery of the income funneled through Precious Princess Productions and Unchained Productions. The Debtor asserted a counterclaim.

The bankruptcy court ruled in favor of the Defendants as to the Complaint. It ruled against the Debtor on his Counterclaim.[3] The Debtor did not appeal the ruling on his Counterclaim.[4]

Thereafter, in response to Wilson's request that the bankruptcy court amend or

---

[3]    The bankruptcy court determined that it had jurisdiction to enter a final judgment on the Complaint and the Counterclaim. Neither party raised the court's authority to enter a final judgment as an issue on appeal. At oral argument, counsel for the parties stated affirmatively that they conceded the court's jurisdiction.

[4]    The Debtor sought to reject the 2007 and 2008 AMAs. The court held that those AMAs were rejected. The parties make no arguments on appeal regarding the rejection of the AMAs, and we consider any appeal of that portion of the bankruptcy court's decision to be abandoned. Nevertheless, we would affirm the rejection decision for the same reasons we affirm the bankruptcy court's ruling on Wilson's § 523 claims.

12

make additional findings of fact, amend the court's Judgment, and grant a new trial on the Debtor's adversary proceeding, the court entered an order, making additional findings as to termination by Debtor of any effective contract between the Debtor and Wilson, and denying the requests for a new trial and to amend his Judgment (Post-Judgment Order).

## STANDARD OF REVIEW

We review the bankruptcy court's findings of facts for clear error and its conclusions of law *de novo*. *Heide v. Juve (In re Juve),* 761 F.3d 847, 851 (8 th Cir. 2014). The court's interpretation of state law is reviewed *de novo*. *County of Ramsey v. MERSCORP Holdings, Inc.,* 776 F.3d 947 (8th Cir. 2014). "[W]hether a contract is unconscionable is a question of law for the court to decide." *Fransmart, LLC v. Freshii Dev., LLC (In re Fransmart)*, 768 F. Supp.2d 851, 871 (E.D. Va. 2011) (citing *Art's Flower Shop v. C&P Tel. Co.*, 413 S.E.2d 670 (W. Va.1991)) and *Jones v. Dere*, No. LW-2612-4, 1995 WL 1055959, at *4 (Va. Cir. Ct. Aug. 16, 1995)); *Snydor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302, 305 (4th Cir. 2001) ("We first decide whether the district court properly concluded that the arbitration agreement was unconscionable."). Where the court is required to make factual findings to determine whether the unconscionability standard was met, the case presents a mixed question of law and fact. *Besta v. Beneficial Loan Co. of Iowa*, 855 F.2d 532, 533 (8th Cir. 1988); *U.S. Dep't of Health & Human Servs., v. Smitley*, 347 F.3d 109, 115-116 (4th Cir. 2003) (when considering dischargeability of in context of HEAL student loan, application of unconscionability standard to facts of case presented mixed question law and fact).

## DISCUSSION

### A.    Dischargeability under 11 U.S.C. § 523

The bankruptcy court properly determined that Wilson had no action under Bankruptcy Code §523 because the Debtor owes no debt to Wilson. Section 523 sets

13

forth categories for which a discharge under § 727 "does not discharge an individual debtor from any *debt*." 11 U.S.C. § 523(a) (emphasis added). For § 523(a) to apply in the first instance, there must be a debt.

The bankruptcy court appropriately stated that Wilson set forth no cause of action under § 523 because the 2007 and 2008 AMAs were void as unconscionable and, as a result, there was no debt owed to Wilson.[5] Contrary to arguments by Wilson otherwise, the Debtor did not waive the unconscionability argument. In addition, we agree with the bankruptcy court's decision to refrain from hearing Wilson's argument that the unconscionability defense was barred by the Virginia statute of limitations. We also agree that Wilson has no claim for a lost investment in the Debtor or his career, or any other basis for asserting a debt.

## (I)  Unconscionability

### (i)  Consideration of unconscionability

According to Wilson, an unconscionability defense was prohibited because it was not set forth as an affirmative defenses in the Debtor's pleadings. We disagree. As was recognized by the bankruptcy court in the Post-Judgment Order, unconscionability was an issue known from the beginning of the adversary proceeding (and before). Moreover, the issue of unconscionability was raised at a pre-trial conference and then at trial, with much of the evidence at trial centering on unconscionability. And, Wilson filed a supplemental trial brief on the discreet issue of unconscionability. Federal Rule of Civil Procedure 15(b)(2), made applicable by Federal Rule of Bankruptcy Procedure 7015, states that "[w]hen an issue not raised

---

[5]     Consistent with affirming the bankruptcy court's ruling that the Debtor owes no debt to Wilson, we also affirm the court's decision to enter judgment in favor of Tamar and Precious Princess Productions on the Complaint.

by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." FED. R. CIV. P. 15(b)(2). There can be no questions that, given the circumstances, the issue of unconscionability was tried by (at the very least) the implied consent of Wilson. We also note that Wilson never argued before the bankruptcy court (prior to trial, at trial or otherwise) that a consideration of unconscionability was disallowed because it had not been plead.

### (ii)   Statute of limitations

We also agree with the bankruptcy court's decision to deny Wilson's request to apply a Virginia statute of limitations defense. According to Wilson, unconscionability was not raised until a pre-trial conference in October 2013, which was after the expiration of the statute of limitations for such a claim under either the 2007 AMA or the 2008 AMA. However, the bankruptcy court aptly stated in the Post-Judgment Order (and we agree) that the statute of limitations issue was raised by Wilson  for the first time in a post-judgment motion. And, that court properly denied Wilson's request that it consider the issue. *See U.S. v. Gurley*, 434 F.3d 1064, 1069 (8th Cir. 2006) (affirming refusal to consider an issue presented for the first time in a motion to alter or amend judgment).

### (iii)   The 2007 and 2008 AMAs were void as unconscionable

The AMAs provide, and the parties do not contest, that Virginia law applies. In Virginia, unconscionability is "a narrow doctrine." *Snydor*, 252 F.3d at 305 (citation omitted). An "unconscionable bargain has been defined to be 'one that no man in his senses and not under a delusion would make, on the one hand, and as no fair man would accept, on the other.' The inequality must be so gross as to shock the conscience." *Managment Enters., Inc. v. Thorncroft Co., Inc.*, 416 S.E.2d 229, 231 (Va. 1992) (quoting *Smyth Bros.-McLeary-McLellan Co. v. Beresford*, 104 S.E. 371, 382 (Va. 1920)). "A plaintiff alleging that a contract is unconscionable must prove that claim by clear and convincing evidence." *March v. Tysinger Motor Co., Inc.*,

15

No. 3:07-CV-508, 2007 WL 4358339, at *4 (E.D. Va. Dec. 12, 2007). "A court may void a contract on the grounds that it is unconscionable." *Reel v. Anderson Fin. Servs.*, LLC, No. 5:07CV00080, 2008 WL 53222, at * 6 n. 7 (W.D. Va. Jan. 2, 2008) (citing *Smyth Bros.-McLeary-McLellan Co.*, 104 S.E. at 382).

However, " '[c]ourts cannot relieve one of the consequences of a contract merely because it was unwise' ... [or] 'rewrite a contract simply because the contract may appear to reach an unfair result.' " *Pelfrey v. Pelfrey*, 487 S.E.2d 281, 284 (Va. Ct. App. 1997) (citations omitted) (quoting *Rogers v. Yourshaw*, 448 S.E.2d 884, 888 (Va. Ct. App. 1994); *Owens v. Owens*, 86 S.E. 2d 181, 186 (Va. 1955) (same).

The bankruptcy court set forth four aspects of the 2007 and 2008 AMAs by which the Debtor proved by clear and convincing evidence that those agreements were unconscionable as a matter of law: (1) term; (2) Wilson's compensation; (3) inability to terminate; and (4) Wilson's replacement. The court correctly applied Virginia unconscionability law, and the evidence supports its conclusion of unconscionabilty.

### 1. Term

The conclusion that the Debtor met the standard for proving unconscionability is supported by the bankruptcy court's determination that neither the evidence nor the law supported the long term of the 2007 and 2008 AMAs (recall that the 2007 AMA was for a twenty-year term with four two-year extensions options exercisable by Wilson, and the 2008 AMA was for twenty or twenty-five years with Wilson's option to extend for four two-year terms).

The court credited the testimony of Mickey Gilley that a typical management agreement would be for three to five years with renewal options the same length as the original term. The court set forth Gilley's extensive experience in the entertainment industry (he had been in the industry since 1957, had experience as a

16

country music performer and as a country music nightclub owner, and he owned a country music theater in Branson, Missouri for twenty-four years), and reviewed his testimony about what he had seen and experienced in that industry. The court used the seven-year maximum duration for a personal services contract under California statute as a guide (acknowledging that Virginia does not have such a statute). *See* CAL. LAB. CODE § 2855(a). And, it used the 2005 AMA (drafted by an attorney, not Wilson) as a benchmark. The court showed that the California statute and the 2005 AMA were consistent with Gilley's testimony.

According to Wilson, one method of consideration for the extended term of the 2008 AMA, rendering it appropriate, was that Wilson waived his right to collect investments in the Debtor's career totaling over $100,000. The bankruptcy court properly pointed out the deficiencies with that argument, as we discuss in our discussion of Wilson's claim of a lost investment below. In addition, the court acknowledged other arguments made by Wilson (such as that it takes longer to develop the career of an impressionist than it does to develop the career of other artists, and that once developed, the career of an impressionist tends to last longer), and discredited them and him in light of his limited experience managing performers and his lack of experience managing an impressionist. We see no error with this. And, as the bankruptcy court pointed out, Wilson had the Debtor initial the paragraph of the 2007 AMA extending the term, but no other paragraph of that AMA. As the bankruptcy court stated, Wilson's testimony regarding why he had the Debtor initial the twenty-year term in the 2007 AMA (that the twenty-year term looked awkward and that he wanted to be clear this was not a short-term project) showed that Wilson knew that term for the agreement was at least unusual.

### 2. Inability to terminate

Unconscionability was properly grounded on the Debtor's practical inability to terminate the 2007 or 2008 AMA. The evidence supports the bankruptcy court's determination regarding the interminable nature of the agreements.

As stated by the bankruptcy court, Paragraph 10 of the 2007 and 2008 AMAs stated that Wilson "cannot be replaced or fired for any reasons or circumstances" except those specified in Paragraph 12. However, Paragraph 12 (set forth above) does not set forth "reasons or circumstances" upon which the Debtor could fire Wilson. Instead, it set forth a cure period for any alleged breach and, if a breach was not cured, required Virginia arbitration. The record shows that Wilson's response to the Debtor's notice that he considered Wilson to be in breach of his obligations and the Debtor's attempt to terminate the agreement was to insist that the Debtor could not terminate the AMAs and must take the matter to arbitration. However, Wilson would not agree to pay his share of the costs for the arbitration. The bankruptcy court correctly decided that the effect of this was that there was no practical way for the Debtor to terminate the 2007 and 2008 AMAs. Importantly, the bankruptcy court stressed the fact that, according to the contractual terms, the Debtor could be bound by the 2008 AMA until the Debtor was sixty-five years-old and Wilson was eighty-four years-old (regardless of whether Wilson competently performed his duties).

### 3. Wilson's Compensation

The conclusion of unconscionability was also properly grounded upon the bankruptcy court's decision that Wilson's level of compensation under the 2008 AMA was excessive.

The bankruptcy court looked to the language of the three AMAs setting forth Wilson's duties as a "personal manager, advisor and counselor." It also looked at the terms of the AMAs stating what Wilson was *not* ("an employment agent, theatrical agent, or licensed manager"), and what Wilson was *not* promising to do ("procure or produce or attempt to produce, and employment or engagements for the Debtor"). We see no error with the bankruptcy court's assessment, when it compared Wilson's role under the AMAs to the role of a personal manager as stated in an entertainment law treatise and the testimony of Mickey Gilley, that the duties listed for Wilson in

18

the AMAs were consistent with the definition of a personal manager. *See* Thomas D. Seltz, Melvin Simensky, Patricia Acton & Robert Lind, 1 *Entertainment Law 3d: Legal Concepts and Business Practices* § 8:7 at 1.

And, the court properly pointed out the practical difficulty with the fee arrangement. After payment of Wilson's 50% cut of gross proceeds and payment of all expenses from his own 50% share, the Debtor could end up with nothing. In addition, Wilson maintained that he operated as a sole proprietor, but his effective employee (the Debtor) was required to pay the sole proprietor's expenses under both the 2007 and 2008 AMAs.

The unconscionability decision is also supported by, as the bankruptcy court noted, the evidence that the traditional amount of compensation for a personal manager set forth in the employment law treatise and by Gilley (15% -20% or 10% - 25%, respectively) was consistent with the level of compensation in the 2005 AMA that was drafted by an attorney. *See* 1 *Entertainment Law 3d* § 8:7 at 1. The court took care to distinguish exceptions to the norm, giving a few examples including the King agreement and King himself, on valid and significant grounds.[6] The record supports the decision that the King deal and the other exceptions referenced by the court were truly exceptions to the rule on compensation. We also agree with the bankruptcy court's assessment that Wilson's record and experience did not merit compensation at an exceptional level.

And, the bankruptcy court appropriately discredited Wilson's stated reason (that he was moving to representing the Debtor exclusively which carried additional risk for him) for the increase in the amount of his compensation (to 50%) from the 2007 AMA to the 2008 AMA. Lastly, we agree with the bankruptcy court that the

---

[6]     The court also distinguished Gilley's 50/50 deal with his own manager and the compensation of the manager for Elvis Presley.

Debtor's arrangement with Precious Princess Productions and Unchained Productions is distinguishable and irrelevant to the determination of unconscionability of the AMAs.

### 4. Wilson's Replacement

Likewise, the evidence supports the decision of unconscionability based on the fact that the 2007 and 2008 AMAs allowed Wilson to hire a replacement for himself for the remaining term of the contracts in the event he was unable to perform. And, under the 2008 AMA, Wilson's "benefactor" received notable benefits such as compensation for the remainder of the term and the ability to choose a replacement for Wilson (with the Debtor's approval, but at the same rate of compensation) for the remainder of the term. The 2005 AMA, which was drafted by an attorney, allowed the Debtor to terminate Wilson upon thirty days written notice if Wilson was unable to perform under the agreement. The court contrasted with that provision the sections of the 2007 and 2008 AMAs dictating what would happen if Wilson was unable to perform. The very language of the 2007 and 2008 AMAs supported the bankruptcy court's recognition that Wilson's changes to the AMAs rendered it unconscionable.

In addition to the problems with the term, inability to terminate, Wilson's compensation and Wilson's replacement, the bankruptcy court appropriately stated that Wilson was more sophisticated than the Debtor and the Debtor testified that Wilson often asked him to sign documents that he had not read. The court then stated that any procedural imbalance was overshadowed by the exceptionally harsh and oppressive substantive terms of the AMAs.

Wilson attacks the bankruptcy court's use of Mickey Gilley's testimony, the entertainment law treatise, and California Labor Code § 2855(a) in its decision regarding the term and Wilson's compensation under the AMAs. According to Wilson, the bankruptcy court supplemented the record with these materials because it recognized that the Debtor could not meet his burden of proving unconscionability.

20

We disagree. The Debtor provided an ample basis upon which the court held the AMAs were unconscionable, and the bankruptcy court's use of these materials as part of its analysis was proper. Moreover, any error by the bankruptcy court was harmless error. And, in addition to term and compensation of the AMAs, the court also relied on the Debtor's inability to terminate the AMAs and the provision for them regarding a replacement for Wilson.

The entertainment law treatise, the California statute and Gilley's testimony were properly considered by the court. We see no error with the bankruptcy court's use of its research from reputable legal authorities to support its decision. In addition, the court acted within its bounds when it allowed, credited and cited to Gilley's testimony. The court recognized Gilley's extensive experience in the entertainment industry and in various country music roles in particular. Gilley testified from that experience. Likewise, we disagree with Wilson's argument that the bankruptcy court misinterpreted Gilley's testimony

### (II)   No loss of an investment by Wilson

Wilson maintains that he is entitled to reimbursement for the funds he invested in the Debtor and that, but virtue of that investment, he is a creditor and the holder of a debt. We disagree.

The bankruptcy court recognized that any right of Wilson to collect funds from the Debtor would have been property of Wilson's own bankruptcy estate. Wilson failed to disclose in his bankruptcy case any debt owed by the Debtor. Therefore, Wilson is judicially estopped from claiming that he is owed funds from any investment in the Debtor prior to his own March 6, 2008 bankruptcy filing.[7] Judicial estoppel "protects the integrity of the judicial process." *Stallings v. Hussmann Corp.*,

---

[7]   Wilson contends that in the 2008 AMA the Debtor acknowledged a debt of more than $100,000. However, the 2008 AMA is void.

21

447 F.3d 1041, 1048 (8th Cir. 2006). Although, the circumstances for invocation of judicial estoppel cannot be reduced to a formula, certain factors guide a court in its exercise of its discretion to apply judicial estoppel. *See New Hampshire v. Maine*, 532 U.S. 742, 749, 751 (2001). The factors are whether: (1) "a party's later position [is] clearly inconsistent with its earlier position;" (2) "the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id*. at 750-751 (internal citations and quotation marks omitted).

Wilson's failure to list debt owed to him by the Debtor in Wilson's bankruptcy case is inconsistent with his assertion in this case that the Debtor owes a debt to him. The bankruptcy court in Wilson's case adopted Wilson's position when it issued a Chapter 7 discharge. *Stallings*, 447 F.3d at 1048 (citing *Superior Crewboats, Inc. v. Primary P&I Underwriters (In re Superior Crewboats, Inc.)*, 374 F.3d 330, 335 (5th Cir. 2004) ("For example, where the bankruptcy court issues a 'no asset' discharge, the bankruptcy court has effectively adopted the debtor's position."). Wilson would gain an unfair advantage if he were able to hide his alleged cause of action from his own creditors and then later reap the benefits of it. Wilson filed his bankruptcy case at the time when he was advising the Debtor to move to Pigeon Forge, and a couple of months before the 2008 AMA. He can hardly claim that his failure to schedule the debt he believed was owed to him from the Debtor was inadvertent or a good-faith mistake. Moreover, the record supports the bankruptcy court's statement that all expenses and loans to the Debtor from 2007 were repaid.

In addition, for Wilson's alleged investments of $100,000, the bankruptcy court correctly stated that the documentation did not support such expenses. Moreover, as stated by the bankruptcy court, the evidence did not show a loss by

22

Wilson of an investment in the SMEC deal in 2008. The record supports the bankruptcy court's statement that Wilson did not have significant unpaid expenses after filing his bankruptcy petition and before termination of the SMEC agreement months later. The 2008 AMA allowed Wilson to recover his expenses prior to the Debtor receiving his share of funds, but Wilson testified the parties would have received the same amount on July 15, 2008. In addition, there is evidence that, as the court stated, the Debtor and Wilson had both received approximately the same amount of the funds paid out by W&W in 2007 and 2008.

And, importantly, the court recognized that Wilson's arguments presume that the Debtor borrowed money from Wilson. This was contrary to Wilson's position that W&W was a sole proprietorship. We agree with the bankruptcy court's statement that any funds Wilson advanced would not have been a loan to the Debtor. Rather, they would have been an investment in his sole proprietorship.

We similarly reject Wilson's contentions that he is entitled to compensation for his efforts developing the Debtor's career. As the bankruptcy court recognized, the Debtor has talent, and Wilson did not help or advance his career.

### (III) Additional arguments

Wilson maintains that even if the 2007 and 2008 AMAs are void, he is entitled to a judgment under the 2005 AMA. That argument lacks merit. The 2005 AMA was superseded when the terms of the 2005 AMA were subsequently incorporated into the 2007 and 2008 AMAs (although some terms suffered drastic modifications). Neither the record nor the subsequent AMAs reflect an expression of intent that the 2005 AMA should survive or spring back. In addition, the briefs on appeal include arguments about whether the offending terms should have been severed from the AMAs and whether the AMAs were breached and terminated (including related arguments of whether the Debtor waived any claim of breach or ratified the AMAs).

23

We affirm the bankruptcy court's decision that the AMAs were void in their entirety. Therefore, we do not consider these issues. We have considered additional arguments by Wilson, such as that the Debtor is estopped from claiming unconscionability, and hold that any such arguments lack merit.

In summary, the 2007 and 2008 AMAs were unconscionable. In addition, Wilson has shown no loss of an investment in the Debtor or his career that would qualify Wilson as the holder of a debt. Moreover, none of the additional arguments asserted by Wilson show he is owed a debt. Without a debt, Wilson has no cause of action under Bankruptcy Code § 523.

## B.    11 U.S.C. § 727

We also affirm the bankruptcy court's decision that Wilson did not prevail in his action for denial of the debtor's discharge under Bankruptcy Code § 727(a).

Section 727(c) specifies who may object to the granting of a debtor's discharge. It states that "[t]he trustee, a creditor, or the United States Trustee may object to the granting of a discharge under subsection (a) of this section."  11 U.S.C. § 727(c). However, Wilson is not a creditor of the Debtor. As stated, the 2007 and 2008 AMAs were void as unconscionable. In addition, as stated, Wilson was judicially estopped from claiming he was a creditor for any amount prior to his own bankruptcy filing. Lastly, the record did not support an unpaid investment by Wilson to the Debtor for the period after his bankruptcy filing.

Assuming arguendo that Wilson was entitled under § 727(c) to object to the grant of the Debtor's discharge, Wilson failed to prove grounds for denial of the Debtor's discharge under § 727(a).

**(I)  § 727(a)(2)**

Bankruptcy Code § 727(a)(2) states:

(a) The court shall grant the debtor a discharge, unless--

. . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--

    (A) property of the debtor, within one year before the date of the filing of the petition; or

    (B) property of the estate, after the date of the filing of the petition;

11 U.S.C. § 727(a)(2)(A) and (B).

The record supports the bankruptcy court's decision that, since Wilson was not a creditor of the Debtor, and Wilson did not prove the Debtor or Tamar transferred the Debtor's income to Precious Princess Productions or Unchained Productions with the intent of defrauding anyone else, Wilson failed to prove a cause of action under § 727(a)(2). *See Georgen-Running v. Grimlie (In re Grimlie)*, 439 B.R. 710, 716 (B.A.P. 8th Cir. 2010) (A § 727(a)(2) action requires proof that "the debtor took the actions with the intent to hinder, delay or defraud creditors. . . .") (internal quotation marks omitted) (quoting *Sullivant v. Bieniek (In re Nieniek)*, 417 B.R. 133, 137 (Bankr. D. Minn. 2009)). And, we see nothing in the record to contradict this.

**(II)  § 727(a)(3)**

Section 727(a)(3) states:

(a) The court shall grant the debtor a discharge, unless--

. . .

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to

keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

11 U.S.C. § 727(a)(3).

The bankruptcy stated that Wilson had met his burden of proving the records were inadequate. However, that court also recognized the unusual situation in this case regarding the keeping of the Debtor's records. And, there exists a substantial basis in the record to support the bankruptcy court's decision that, in this type of business, with Tamar in charge of the records, and in light of her record keeping abilities and the circumstances during the relevant period (including Tamar's surgeries, pregnancies and complications in connection therewith, and issues with children), the failure to keep detailed records was understandable and justifiable. *See McDermott v. Swanson (In re Swanson)*, 476 B.R. 236, 240 (B.A.P. 8th Cir. 2012) (citations omitted) (Once the party seeking denial of the discharge "has shown that the debtor's records are inadequate, the burden of production shifts to the debtor to offer a justification for his record keeping (or lack thereof); however, the objecting party bears the ultimate burden of proof with respect to all elements of this claim.").

### (III)  § 727(a)(4)

Bankruptcy Code § 727(a)(4) states that "[t]he court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account . . .." 11 U.S.C. § 727(a)(4)(A).

The bankruptcy court examined the Debtor's schedules and stated that the Debtor disclosed the arrangement by which he and his wife structured their finances to avoid Wilson. We agree with this assessment. The court also recognized that to have a cause of action for a false oath under § 727(a)(4), the statement needs to be material and made with intent. *See Korte v. Internal Revenue Serv. (In re Korte),* 262

26

B.R. 464, 474 (B.A.P. 8th Cir.2001) (citing *Mertz v. Rott*, 955 F.2d 596, 597–98 (8th Cir.1992)).  We see support in the record for the bankruptcy court's statement that, to the extent the Debtor's schedules are inaccurate in any other respect, the Debtor did not intend to deceive anyone and the statements are not material.

## CONCLUSION

For the reasons stated, we affirm the rulings of the bankruptcy court.